13 A.3d 435 (2010)
418 N.J. Super. 323
BANK OF NEW YORK, as Trustee for Home Mortgage Investment Trust 2004-4 Mortgage-Backed Notes, Series 2004-4, Plaintiffs,
v.
Michael J. RAFTOGIANIS, his/her heirs, devisees and personal representatives, and his, her, their or any of their successors in right, title and interest, Roman J. Krywopusk, his/her heirs, devisees and personal representatives, and his, her, their or any of their successors in right, title and interest, Defendants.
No. F-7356-09
Superior Court of New Jersey, Chancery Division, Atlantic County.
Decided June 29, 2010.
*437 Brian C. Nicholas for plaintiff (Zucker, Goldberg & Ackerman, attorneys).
Eric Garrabrant for defendant Roman J. Krywopusk (Flaster Greenberg, attorneys).
W.C. TODD, P.J.Ch.
This opinion deals with the plaintiff's right to proceed with an action to foreclose a mortgage which secures a debt evidenced by a negotiable note. The original lender elected to use the Mortgage Electronic Registration System (hereinafter "MERS") in recording the mortgage by designating that entity, as its nominee, as the mortgagee. The note and mortgage were subsequently securitized, without notice to the borrower. This action to foreclose the mortgage was filed years later, in the name of an entity created as a part of the securitization process. The defendant/borrower challenged plaintiff's right to proceed with the foreclosure. That challenge, framed as a dispute over "standing," has given rise to a variety of factual and legal issues typically raised in this type of litigation. Ultimately, the questions presented were whether plaintiff could establish its right to enforce the obligation evidenced by the note, and whether it must establish that it held that right at the time the complaint was filed. The answers to those questions require an understanding of the provisions of the Uniform Commercial Code (hereinafter "UCC"), MERS, the securitization of mortgages, and how foreclosure litigation is handled. This opinion addresses those disputes. Ultimately, the court concludes that it was appropriate to require plaintiff to establish that it had physical possession of the note as of the date the complaint was filed. Plaintiff was unable to establish that, either by motion or at trial. Accordingly, the complaint has now been dismissed on terms permitting plaintiff to institute a new action to foreclose, on the condition that any new complaint must be accompanied by an appropriate certification, confirming that plaintiff is then in possession of the note.
In this case the defendant borrowed $1,380,000 from American Home Mortgage Acceptance, Inc. (hereinafter "American Home Acceptance") in September 2004. This action to foreclose the mortgage was brought in the name of The Bank of New York as Trustee for American Mortgage Investment Trust 2004-4 Mortgage Backed Notes, Series 2004-4 in February 2009. In the interim, a variety of transactions took place, involving a number of entities. Those transactions will be discussed in some detail below. Preliminarily, this opinion will discuss the UCC, *438 MERS and the securitization process in more general terms.

THE UNIFORM COMMERCIAL CODE
Mortgages provide security for the debtor's obligation to pay an underlying obligation, ultimately permitting the mortgagee to force the sale of the property to satisfy that obligation. As a general proposition, a party seeking to foreclose a mortgage must own or control the underlying debt. See Gotlib v. Gotlib, 399 N.J.Super. 295, 944 A.2d 654 (App.Div. 2008); Garroch v. Sherman, 6 N.J.Eq. 219 (Ch.1847); Bellistri v. Ocwen Loan Servicing, LLC, 284 S.W.3d 619 (Mo.App.2009). The debt itself is typically evidenced by some other document. The manner in which one obtains control over the debt will depend upon the nature of the underlying obligation.
Typically, the debt secured by a mortgage will be evidenced by a bond or a note. Notes, in turn, may be negotiable or nonnegotiable. The handling of negotiable instruments presents a variety of distinct issues, precisely because they are negotiable. Issues may be presented, in a variety of circumstances, as to just how interests in a negotiable instrument can be transferred or "negotiated," and as to the rights and responsibilities of those involved, including the original obligor, the original obligee and third parties. Disputes over the handling of negotiable instruments can arise in a variety of contexts.
Negotiable instruments, which include negotiable notes, are governed by Article 3 of the UCC, codified in this state as N.J.S.A. 12A:X-XXX-XXX. Checks, drafts, and certificates of deposit are other forms of negotiable instruments, which are subject to the UCC. There are specific provisions of the UCC dealing with just who may enforce an instrument. One's ability to enforce an instrument will depend on one's status, which in turn depends on what interests have been acquired and just how those were acquired. In that context, it is often necessary to determine whether the person seeking to enforce the note is a "holder" or has some other status. How one becomes a holder will depend, at least in part, on the nature of the instrument or note. Different rules apply to notes which are payable "to bearer" or "to order." It is generally necessary to determine whether a negotiable note has effectively been transferred and/or negotiated.
As an aside, different issues may be presented when the debt is evidenced by a bond or a nonnegotiable note. Nonnegotiable notes are transferred by "assignment" and not by "negotiation," without reference to the provisions of the UCC dealing with negotiable instruments. See 29 N.J. Practice, Law of Mortgages § 11.2, at 749 (Myron C. Weinstein) (2d ed.2001) and 1 Nelson & Whitman Real Estate Finance Law § 5.28 (3d ed.1993). Additional issues may also be presented where it is necessary to determine whether one who is a holder is also a "holder in due course," which may affect the defenses that can be asserted against the holder in an action to enforce the note. Neither of those circumstances are presented here. In that context, this opinion focuses on the plaintiff's right to enforce a negotiable note, without reference to its potential status as a holder in due course.
A number of provisions of the UCC deal with the right to enforce negotiable instruments. The issues presented here are dealt with most directly in N.J.S.A. 12A:3-301. That section of the statute reads as follows:
"Person entitled to enforce" an instrument means the holder of the instrument, a nonholder in possession of the instrument who has the rights of the holder, or a person not in possession of *439 the instrument who is entitled to enforce the instrument pursuant to 12A:3-309 or subsection d. of 12A:3-418. A person may be a person entitled to enforce the instrument even though the person is not the owner of the instrument or is in wrongful possession of the instrument.
The issue presented here is whether plaintiff was, at the appropriate time, either "the holder of the instrument," or "a nonholder in possession of the instrument who has the rights of the holder." (N.J.S.A. 12A:3-309 deals with the enforcement of instruments which have been lost, destroyed or stolen. Subsection d. of N.J.S.A. 12A:3-418 deals with circumstances where an instrument has been paid or accepted by mistake and the payor or acceptor recovers payment or revokes acceptance. Neither of those sections of the statute apply here.) The resolution of that issue depends on the nature of the note and just what was done with the note itself.
How does one become a holder of a negotiable note? In addressing that question it is necessary to distinguish between "transfer" and "negotiation." It is also necessary to distinguish between the handling of notes payable "to order" and notes payable "to bearer." In this particular case, it is also necessary to recognize that a note initially made payable "to order" can become a bearer instrument, if it is endorsed in blank. See N.J.S.A. 12A:3-109(c), providing that an instrument payable to an identified person may become payable to bearer if it is endorsed in blank. See also N.J.S.A. 12A:3-205(b) (describing what qualifies as a blank endorsement); and Miller & Harrell, The Law of Modern Payment Systems and Notes § 2.02 at 77-78 (2002) (noting that an instrument bearing the endorsement "Pay to the order of ____" is a bearer instrument). Such a bearer note can be both transferred and negotiated by delivery alone. See Corporacion Venezolana de Fomento v. Vintero Sales, 452 F.Supp. 1108, 1117 (S.D.N.Y.1978).
Under the UCC, the transfer of an instrument requires that it be delivered for the purpose of giving the person receiving the instrument the right to enforce it. A negotiable note can be transferred without being negotiated. That transfer would be effected by the physical delivery of the note. See N.J.S.A. 12A:3-203(a). In that circumstance, the transferee would not be a holder, as that term is used in the UCC. Such a transferee, however, would still have the right to enforce the note. The UCC deals with that circumstance in the following language:
Transfer of an instrument, whether or not the transfer is a negotiation, vests in the transferee any right of the transferor to enforce the instrument, including any right as a holder in due course, but the transferee cannot acquire rights of a holder in due course by a transfer, directly or indirectly, from a holder in due course if the transferee engaged in fraud or illegality affecting the instrument.
[N.J.S.A. 12A:3-203(b).]
The negotiation of the instrument, on the other hand, requires both a transfer of possession and an endorsement by the holder. An instrument which is payable to bearer may be negotiated by transfer alone. Put otherwise, an instrument payable "to order" can be negotiated by delivery with an endorsement, while an instrument payable "to bearer" can be negotiated by delivery alone. N.J.S.A. 12A:3-201. To enforce the note at issue here, as a holder pursuant to N.J.S.A. 12A:3-301, plaintiff would have to establish that it received the note, through negotiation, at the appropriate time. That would require that the note *440 be endorsed prior to or at the time of delivery, either in favor of plaintiff or in blank.
N.J.S.A. 12A:3-301 also provides that an instrument may be enforced by "a non-holder in possession of the instrument who has the rights of a holder." How does one obtain that status? There are a variety of circumstances where a party may obtain that status. That may occur, by example, where a creditor of a holder acquires an instrument through execution. See Miller and Harrell, supra at § 3.01. More frequently, that status will be created by the "transfer" of the instrument, without negotiation. As already noted, transfer occurs when the instrument is delivered for the purpose of giving the person receiving the instrument the right to enforce it. See N.J.S.A. 12A:3-203(a). The statute also provides that the transfer of the instrument, without negotiation, vests in the transferee the transferor's right to enforce the instrument. See N.J.S.A. 12A:3-203(b). That circumstance can be illustrated by reference to the dispute presented here. The note at issue, as originally drafted, was payable "to the order of" the original lender. The negotiation of the note, in that form, would require endorsement, either to a designated recipient of the note or in blank. The note, however, could be transferred without an endorsement. Assuming the transfer was for the purpose of giving the recipient the ability to enforce the note, the recipient would become a "nonholder in possession with the rights of a holder." That would require, however, the physical delivery of the note. A number of cases recognize that there can be constructive delivery or possession, through the delivery of the instrument to an agent of the owner. See Midfirst Bank, SSB v. C.W. Haynes & Co., 893 F.Supp. 1304, 1314-15 (D.S.C.1994); Fed. Deposit Ins. Corp. v. Linn, 671 F.Supp. 547, 553 (N.D.Ill.1987); Corporation Venezolana de Fomento, supra, 452 F.Supp. at 1117.
Under either of the provisions of N.J.S.A. 12A:3-301 which are at issue here, the person seeking to enforce the note must have possession. That is required to be a holder, and to be a nonholder in possession with the rights of a holder. The application of the provisions of the UCC to the dispute presented here will be discussed below.

MORTGAGE ELECTRONIC REGISTRATION SYSTEM
MERS is a unique entity. Its involvement in the foreclosure process has been the subject of a substantial amount of litigation throughout the country, resulting in the issuance of a number of reported opinions. Recently, MERS was the focus of a decision of the Supreme Court of Kansas, reported as Landmark National Bank v. Kesler, 289 Kan. 528, 216 P.3d 158 (2009), which is now cited frequently in this court. That opinion reviews the manner in which MERS functions, the potential problems it can create, and some of the competing policy issues presented. The opinion also cites a variety of published opinions from around the country, addressing those same issues.
In essence, MERS is a private corporation which administers a national electronic registry that tracks the transfer of ownership interests and servicing rights in mortgage loans. Lenders participate as members of the MERS system. When mortgage loans are initially placed, the lenders will retain the underlying notes but can arrange for MERS to be designated as the mortgagees on the mortgages which become a part of the public record. In that context, the lenders are able to transfer their interests to others, without having to record those subsequent transactions *441 in the public record. See Mortgage Elec. Reg. Sys. Inc. v. Neb. Dep't Banking, 270 Neb. 529, 704 N.W.2d 784 (2005) (cited in Landmark). The process is apparently cost efficient, from the perspective of the lenders. Among other things, the use of MERS permits lenders to avoid the payment of filing fees that might otherwise be required with the filing of multiple assignments. By the same token, it can make it difficult for mortgagors and others to identify the individual or entity which actually controls the debt at any specific time. See Landmark, 216 P.3d at 168. On occasion, foreclosure actions are also brought in the name of MERS. When MERS is involved, defendant/borrowers often argue there has been a "separation" of the note and mortgage impacting on the plaintiff's ability to proceed with the foreclosure. That argument has been raised here and will also be addressed below.

SECURITIZATION
This case also involves the securitization of mortgage loans, a practice which is facilitated by the MERS system. Trial courts in this state regularly deal with the foreclosure of mortgages which have previously been securitized. Generally, one or more lenders will sell substantial numbers of mortgage loans they have issued to a pool or trust. Interests in that pool or trust are then sold to individual investors, who receive certificates entitling them to share in the funds received as the underlying loans are repaid. That can occur without any notice to the debtors/mortgagors who remain obligated on the original notes. Other entities, generally called "servicers" are retained to administer the underlying loans. Those servicers or additional "subservicers" will be responsible for collecting and distributing the funds which are due from the debtors/mortgagors. Many are given the authority to institute and prosecute foreclosure proceedings.
The securitization of mortgages has a long and somewhat involved history in this country, dating back to the nineteenth century. More recently, the federal government became involved in various forms of securitization through the Federal National Mortgage Association (FNMA or "Fannie Mae") and the Government National Mortgage Association (GNMA or "Ginnie Mae"). Private institutions became more involved in securitization of mortgages beginning in the 1970s. Over time the structuring and issuance of private mortgage-based securities became much more complex and widespread, contributing to the recent crisis in the financial markets. For a detailed analysis of the history of securitization, the role of pricing models, risk- and term-partitioned securities, and rating agencies, see Christopher L. Peterson, Predatory Structured Finance, 28 Cardozo L.Rev. 2185 (April 2007).
The securitization of mortgages also presents competing policy concerns. The securitization of mortgage debt facilitates the investment of funds from various sources into a pool or trust. That in turn presumably provides additional sources of funds to support mortgage lending. By the same token, the relationships between the holder of the debt and the debtor/mortgagor becomes more attenuated and potentially confusing. That can be particularly problematic when a matter proceeds to foreclosure, when substantial issues may be presented as to the propriety of some type of forbearance, loan modification, or the forced sale of mortgaged property. Additional problems can be presented in those circumstances where a borrower may have potential claims against those involved in making the original loan. At least one commentator has suggested that securitization has placed substantial limitations on attempts to remedy or regulate *442 predatory lending practices. Id. at 2255-73.
As noted, this case involves both MERS and the securitization of the underlying debt. Each of those circumstances can operate independently. Lenders who participate in the MERS system may not be involved in the securitization of their mortgage loans. Similarly, lenders may elect to securitize their mortgage loans without participating in the MERS system. When each circumstance is involved, however, the potential for confusion increases.
It is in that context that it is necessary to address the disputes raised by defendant here as to plaintiffs right to proceed with the foreclosure. Preliminarily, it is appropriate to review the underlying transactions.

DEFENDANT'S LOAN
The property at issue in this matter was purchased by defendants in September 2004. That purchase was funded, at least in part, by a loan from American Home Acceptance in the amount of $1,380,000. Title was taken in the name of defendants Krywopusk and Raftogianis. The loan closed on or about September 30, 2004, which is presumably the date on which title was transferred to defendants. Raftogianis executed a note in the amount just noted, payable to American Home Acceptance. The note provided for interest, at a rate which was subject to adjustment over time. Payments of interest and principal were due on a monthly basis, for a period of approximately thirty years, the first monthly payment being due November 1, 2004. On September 30, 2004, defendants each executed a mortgage encumbering the property, to secure the note. A definitional section of the mortgage describes the "Lender" as American Home Acceptance. The same section of the mortgage refers to MERS as "a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns." The mortgagee, as described in the mortgage itself, is MERS, "as nominee for the Lender." The mortgage was recorded with the Atlantic County Clerk on October 20, 2004. Defendants defaulted on the payments required under the note in October 2008.
The note executed by Raftogianis is clearly a negotiable instrument as that term is defined by the UCC. In the terms of the statute, the note is payable to bearer or to order, and it is payable on demand or at a definite time. While the note contains detailed provisions as to just how payment is to be made, it does not state any other undertaking or instruction by the person promising or ordering payment to do any act in addition to the payment of money. See N.J.S.A. 12A:3-104. The note recites that Raftogianis "promises to pay U.S. $1,380,000.00 ... plus interest, to the order of the Lender," then referring to "the Lender" as American Home Acceptance, beginning with payments due in November 2004. See N.J.S.A. 12A:3-104(a)(1), (2) and (3).
This note, as originally drafted, was payable "to order." At some point, however, the note was indorsed in blank. The original note was produced at oral argument on the motion for summary judgment. It contained the following endorsement:

WITHOUT RECOURSE BY AMERICAN HOME MORTGAGE ACCEPTANCE, INC.

RENEE BURY ASST. SECRETARY
Bury's original signature was just above her printed name in that endorsement. Defendant had signed the note on September 30, 2004, payable to the order of American Home Acceptance. In that form the *443 note could be transferred by delivery, but could only be negotiated by endorsement. The endorsement in blank, however, would effectively make the note payable "to bearer" permitting it to be transferred and negotiated by delivery alone, without any additional endorsement.
While it was clear the note had been indorsed prior to the time it was presented to the court, presumably as a part of the securitization process, it was not clear just when that occurred, or when the note had been physically transferred from American Home Acceptance to some other individual or entity.

THE SECURITIZATION OF THE LOAN
In or about December 2004, a group of mortgage loans held by American Home Acceptance were securitized. While the court is now satisfied that defendants' loan was among that group of loans securitized, that was not at all clear from the documents initially submitted by plaintiff, as will be discussed below. The securitization of the loan was not referenced in the complaint, or even in plaintiff's initial motion for summary judgment. (Judges and lawyers who regularly handle foreclosure litigation would probably recognize that the matter involved a loan which had been securitized just from the description of plaintiff in the complaint, such as "The Bank of New York as Trustee for American Mortgage Investment Trust 2004-4 Mortgage Backed Notes, Series 2004-4". There is no apparent reason, however, why a layperson not familiar with the securitization process would recognize that.) The materials which were ultimately presented, however, did document the process by which the mortgage loans were securitized.
The documents provided in this case are typical of those presented in other matters involving the securitization of mortgage loans. Those documents are lengthy, complex, and difficult to understand. Included in the materials ultimately provided was a Mortgage Loan Purchase Agreement, an Amended and Restated Trust Agreement, an Indenture, and a Servicing Agreement. (The Indenture in this case is in excess of 100 pages, without attachments. An attachment which simply defines the terms used in the Indenture itself contains fifty-five pages.) Much of that complexity in those documents relates to the interests held by those who invest in the securitized loans, and how the Trust is structured and administered. The transfers or assignments of the underlying mortgage loans involve other complexities.
Defendants' original lender was American Home Acceptance. Under the terms of the Mortgage Loan Purchase Agreement, American Home Acceptance, as seller, sold its interests in a group of mortgage loans to American Home Mortgage Securities, LLC (hereinafter "American Home Securities"), as purchaser. The Mortgage Loan Purchase Agreement contemplates an additional transfer of those mortgage loans by American Home Securities to the Trust. It also refers to The Bank of New York as Indenture Trustee for the Trust.
The Amended and Restated Trust Agreement provides for the creation of the Trust itself, apparently amending a prior Trust Agreement. That Amended and Restated Trust Agreement involves three primary partiesAmerican Home Securities (the Depositor), Wilmington Trust Company (the Owner Trustee), and The Bank of New York (the Indenture Trustee). One portion of the Trust Agreement recites that the Depositor does thereby transfer its right, title and interest in the mortgage loans to the Trust. Another section of the Trust Agreement reflects the Owner Trustee's acknowledgement of receipt of the *444 mortgage loans. Another section of the Trust Agreement notes that the mortgage loans will be assigned to the Indenture Trustee, pursuant to the Indenture.
The Indenture itself does provide for that additional transfer to The Bank of New York as Indenture Trustee. There are two primary parties to the Indenturethe Trust itself, described as the Issuer, and The Bank of New York, as Indenture Trustee. The Indenture recites that the Issuer does grant to the Indenture Trustee all its right, title, and interest in the mortgage loans, as well as its rights under the Mortgage Loan Purchase Agreement. The same portion of the Indenture contains the Indenture Trustee's acceptance of the trust, "as trustee on behalf of the Holders of the Notes and the Insurer," referring to those who have invested in the securitized mortgages. In a subsequent portion of the Indenture, The Bank of New York, as Indenture Trustee, covenants that it will establish an "Eligible Account" in which it will deposit each remittance it receives from the servicer with respect to the mortgage loans.
The Servicing Agreement confirms the arrangements for the servicing of the mortgage loans. There are three primary parties to the Servicing Agreement American Home Mortgage Servicing Inc., described as the RMBS Master Servicer, the Trust as Issuer, and The Bank of New York as Indenture Trustee. The Servicing Agreement specifically provides the servicer with the authority to proceed with foreclosures. Notably, the same section of the Servicing Agreement authorizes the servicer to register mortgage loans with MERS, and to cause a mortgage loan to be removed from registration with MERS.
The various documents noted were dated "as of" December 21, 2004, suggesting they may actually have been executed on some other date. Testimony was presented at trial confirming that the documents were all executed on December 21, 2004, the date of the closing on the securitization of the loans.
It is apparent that the parties to the securitization did understand that some of the loans being securitized were evidenced by negotiable notes. Several provisions deal with the handling of the notes in very specific terms. Deutsche Bank National Trust Company is identified as Custodian for the Indenture Trustee. The Mortgage Loan Purchase Agreement provides that American Home Acceptance, as seller, acting on behalf of American Home Securities as purchaser, is to deliver and deposit the original mortgage notes, "endorsed without recourse to the order of the Indenture Trustee or in blank" to Deutsche Bank as custodian, "on or before the closing date." The closing date is identified elsewhere in the documents as December 24, 2004. In addition, the Indenture provides that the Indenture Trustee is to cause the Custodian, as agent for the Indenture Trustee, to acknowledge receipt of documents referred to in the Mortgage Loan Purchase Agreement, which would include the mortgage notes. In short, the documents indicate that the parties to the securitization process did intend that the mortgage notes being securitized would be endorsed in favor of the Indenture Trustee or in blank, and would be held by Deutsche Bank as custodian, acting for the Indenture Trustee. The endorsement appearing on the copy of the note provided by plaintiff in conjunction with the motion for summary judgment is consistent with those documents. The actual delivery of the notes to Deutsche Bank as custodian, would presumably constitute constructive delivery to the Indenture Trustee.
Separate questions are presented, however, as to whether the note was in fact physically transferred to plaintiff, when *445 that would have occurred, and whether the note had been endorsed prior to that time. Those are issues that would have to be addressed before one could determine whether the plaintiff was a person entitled to enforce the note pursuant to the UCC at any particular time.

PROCEDURAL HISTORY

THE MISSING LOAN SCHEDULE
The original complaint in this matter was filed in the name of Bank of New York as Trustee for American Mortgage Investment Trust 2004-4 Mortgage-Backed Notes, Series 2004-4 on February 9, 2009. It recited that plaintiff had become the owner of the note and mortgage "before the within complaint was drafted." It does not refer to the securitization of the loan, any of the entities involved in the securitization process, or any transfer or assignment from either American Home Acceptance or MERS. The complaint provided no information as to possession of the note.
Krywopusk filed an answer, counterclaim, and crossclaim on May 6, 2009. Plaintiff, apparently unaware of the filing of defendant's answer, filed an amended complaint specifically reciting the execution and recording of an assignment from MERS. That amended complaint was not filed until May 7, 2009.
The assignment from MERS was executed and recorded a short time after the complaint was filed. That document is dated February 18, 2009. It is captioned "Assignment of Mortgage." It recites that MERS, as nominee for American Home, transfers and assigns the mortgage at issue to Bank of New York, as Trustee. The assignment refers to the mortgage as securing the note at issue. It recites the transfer of the mortgage "together with all rights therein and thereto, all liens created or secured thereby, all obligations therein described, the money due and to become due with interest, and all rights accrued or to accrue under such mortgage." The assignment was executed by Linda Green, as Vice President of MERS, as nominee for American Home Acceptance. Green's signature was notarized. The assignment was recorded with the Atlantic County Clerk on February 24, 2009. It does appear the assignment was intended to indicate that the debt in question had been transferred to the Bank of New York as Indenture Trustee in February 2009. It is now apparent that is not what occurred.
In any event, the matter proceeded in the vicinage based upon the filing of defendant's contesting answer. While discovery was permitted, the parties apparently elected to forego any formal discovery.
Plaintiff filed its motion for summary judgment in January 2010. The motion was based upon a certification from plaintiff's counsel providing copies of the note, the mortgage, and the February 2009 assignment. While the copy of the note provided with the motion did contain the blank endorsement noted above, there was no information provided as to when the note was indorsed, when the note was physically transferred, or where the note was being held. Defendant filed written opposition, challenging the validity of the MERS assignment. Plaintiff responded with a certification executed by a supervisor for American Home Mortgage Servicing Inc, the servicer for the loans. While that additional certification recited that the note and mortgage had previously been sold to plaintiff, it did that in conclusory terms. No additional documentation was provided. Neither plaintiffs motion nor plaintiffs reply to defendant's opposition addressed the securitization of the debt, or the transfer or negotiation of the underlying note. The court then required the production of the documents executed as a *446 part of the securitization process. The motion was adjourned.
Plaintiff then provided three separate servicing agreements which had apparently been entered into as a part of the securitization process. The servicing agreements were not signed. The underlying documentation was not provided. The court again directed that the underlying documentation be provided. The motion was adjourned again.
The additional documents were provided, with an affidavit executed by another representative of the servicer. Those documents included the Amended and Restated Trust Agreement, the Mortgage Loan Purchase Agreement, the Indenture and the Servicing Agreement. While the copies provided were signed, schedules referenced in the documents as listing the mortgage loans being securitized were not attached. For that reason, there was no way to confirm that defendant's loan was among those which had been securitized. The court again directed plaintiff to supplement its earlier submissions with copies of the applicable schedules. The motion was adjourned again.
Plaintiff's counsel then advised that plaintiff was unable to obtain a copy of the loan schedule at issue, noting that the law firm which had served as closing counsel when the loans were securitized had dissolved, and that plaintiff did not have any other sources which might be able to provide the schedule. In that same correspondence, plaintiff's counsel indicated that his office had requested that the original note be forwarded to it, suggesting the original note could be presented at the time of argument on the motion. Notably, that was the first time that plaintiff's representatives suggested plaintiff would attempt to establish its right to proceed based on its possession of the note. The court declined to adjourn the matter again. Argument was conducted April 23, 2010.
The day before the argument, plaintiff's counsel submitted yet another certification, which appeared to contradict his prior submission. That certification was executed by Glenn E. Mitchell, who described himself as Vice President of The Bank of New York Mellon, as Indenture Trustee. (Notably, that was the first certification executed by an officer or employee of the plaintiff, as opposed to the servicer.) That certification reviewed the underlying circumstances in some detail. Attached to the certification was a redacted loan schedule, referred to in the certification as a "loan schedule for the Trust." The one entry appearing on the redacted schedule appears to list the loan at issue here. It was unclear whether the schedule in question was in fact attached to one or more of the underlying documents. There was no explanation for the apparent change in plaintiff's circumstances, which permitted it to produce the schedule which was previously unavailable.
Plaintiff's counsel did present the original note at the time of argument, and argued that the presentation of the original note alone, at that time, was sufficient to establish plaintiff's right to proceed. That argument was rejected. The motion for summary judgment was denied. A hearing was scheduled to address just how and when the note was transferred, and whether the plaintiff did have the right to enforce the note at the time the complaint was filed. That hearing was conducted in June 2010.

LEGAL ANALYSIS
This is a dispute over plaintiff's right to proceed with the foreclosure. There are a number of ways to frame the issue.
In the most general sense, defendant questioned whether plaintiff could establish *447 that it had, in fact, acquired the right to enforce the note and mortgage. Defendant specifically challenged plaintiff's reliance on the February 2009 assignment from MERS, arguing that MERS simply did not have the authority to assign the note, given the prior "separation" of the note and mortgage. In responding to those challenges, plaintiff has offered a variety of alternative bases for its right to proceed with the foreclosure. At various times, plaintiff has argued that it has established its the right to proceed based on: (1) the February 2009 assignment from MERS alone; (2) the documents executed in or about December 2004 evidencing an intention to transfer the debt to the Trust; and (3) its actual possession of the note, endorsed in blank, as presented at argument on the motion for summary judgment. Focusing on the UCC, plaintiff has argued that it is either a holder, or a nonholder in possession with the right to enforce the note, pursuant to N.J.S.A. 12A:3-301. At trial, plaintiff attempted to establish that it did have possession of the note as of the date the original complaint was filed.
Obviously, there is a temporal component to the dispute. Plaintiff filed its complaint for foreclosure in February 2009, alleging that it had become the owner of the note and mortgage "before the complaint was filed." It then filed an amended complaint in May 2009, referring to the MERS assignment to plaintiff executed in February 2009, suggesting it somehow obtained the right to proceed based on that assignment. By the time motions for summary judgment were argued in April 2010, plaintiff was asserting a right to proceed based on its actual possession of the note at the time the motions were argued, without presenting any meaningful proofs as to the transfer or negotiation of the note, or just when any transfer or negotiation occurred. The ultimate question is clear is this action now being prosecuted by one who does have the authority to enforce the underlying obligation? The temporal question, however, is just as important would it be appropriate to permit plaintiff to proceed with this action for foreclosure if it did not have the right to enforce the note as of the date the complaint was filed?
The remainder of this opinion will address those legal and equitable issues, focusing on the three claims asserted by plaintiff, noted above.

THE MERS ASSIGNMENTTHE SEPARATION OF THE NOTE AND MORTGAGE
The facts presented here are typical. The lender agrees to lend monies to the property owner, to be secured by a mortgage encumbering the property owner's real estate. The property owner executes a note reflecting the obligation to repay the debt, payable to the lender. The property owner also executes a mortgage securing the obligation to repay the debt. The mortgage provides that the property is mortgaged and conveyed to MERS as nominee for lender and the lender's successors and assigns. In short, the note is payable to the lender, and the mortgage is in favor of MERS as nominee for the lender. Defendant suggests that creates a "separation" of the note and mortgage, restricting the ability to foreclose.
Plaintiff's position is relatively simple. In essence, plaintiff indicates that the debt in questionconsisting of both the note and the mortgagehas been transferred to it, that defendants have defaulted on their obligations under the note and mortgage, and that plaintiff should be permitted to proceed through judgment and sale, enforcing its right to look to the property to satisfy the debt. Defendant questions the accuracy and validity of the documents *448 presented by plaintiff, focusing on the alleged "separation" of the note and mortgage, as impacting on plaintiffs right to proceed. In large part, defendant relies on case law indicating that a party seeking foreclosure must own or control the underlying debt, and may not proceed based on his control of the mortgage alone. See, e.g., Gotlib, supra, 399 N.J.Super. 295, 944 A.2d 654; Garroch, supra, 6 N.J.Eq. 219; and Bellistri, supra, 284 S.W.3d 619.
There are a number of components to defendant's argument based on the alleged separation of the note and mortgage. Defendant argues that the note and mortgage were originally held by separate entities the note being held by American Home Acceptance and the mortgage being held by MERS. It follows, defendant argues, that MERS held only the mortgage and not the note, that MERS was not in a position to assign or transfer the note to plaintiff, and that plaintiff therefore cannot have acquired the note. Without the note, defendant argues, plaintiff does not have standing to proceed with the foreclosure. The concepts underlying those arguments are not particularly controversial. Obviously, the law recognizes the distinction between the debt itself and the pledging of collateral to secure the debt. Logically, the right to enforce the mortgage would have to be based on ownership of the underlying debt.
In most circumstances, a note and related mortgage will be held by the same individual or entity. The obligors and obligees referenced on the note and mortgage will generally be the same. Transfers or assignments would involve both instruments. It is difficult to imagine circumstances where one would want to hold a mortgage, without having the right to act on the underlying debt. By the same token, there is no technical reason why the interests could not be separated in one way or another. Indeed, this case does present one somewhat unusual circumstance related to the mortgaging of the propertythe note in this case was signed by Raftogianis alone, while the mortgage was signed by both Raftogianis and Krywopusk.
Defendant argues that the note and mortgage were "separated" when those documents were first created, distinguishing between the designation of American Home Acceptance as the payee on the note, and MERS as nominee for American Home Acceptance as the mortgagee. The argument is creative, but not convincing. It ignores the most basic circumstance presented. It should be obvious to anyone with any basic understanding of the circumstances that there was no real intent to "separate" the note and mortgage. The debt in question was clearly payable to American Home Acceptance. The designation of MERS as nominee on the mortgage was simply intended to permit the recording of the mortgage in a way that would facilitate subsequent transfers through MERS without the recording of additional documents. One could debate the propriety and efficacy of using MERS in terms of policy. It is clear, however, that there was no real intent to separate ownership of the note and mortgage at the time those documents were created.
The issue is framed, at least in part, by the description of MERS as "nominee." The use of that term, as it is used by MERS, was analyzed in some detail in the decision of the Supreme Court of Kansas in Landmark, supra, 289 Kan. 528, 216 P.3d 158, a case relied upon by defendant. Landmark involved a property which was encumbered by two mortgages. Id. at 161. The loan provided by Landmark National Bank was secured by a first mortgage payable to it. Ibid. There was a second mortgage on the property securing *449 a loan that had been provided by Millennia Mortgage Corp. Millennia was a participant in MERS. Ibid. The second mortgage securing the debt due Millennia was in the name of MERS "solely as nominee" for Millennia. Ibid. The Millennia mortgage was subsequently transferred or assigned to Sovereign Bank. Ibid. That transfer was not reflected in the public record. Ibid. Landmark filed an action to foreclose its first mortgage naming Millennia but neither MERS nor Sovereign as defendants. Ibid. No one responded on behalf of Millennia and the matter proceeded through judgment and sale. Ibid. Sovereign subsequently filed a motion to set aside the judgment, arguing that MERS was a "contingently necessary party" under Kansas law. Id. at 162. The trial court concluded that MERS was not a real party in interest and denied the motion to set aside the judgment. Ibid. Both the Court of Appeals and the Supreme Court of Kansas affirmed, essentially concluding that MERS did not have any real interest in the underlying debt. Id. at 162, 169-70. Notably, the opinion of the Supreme Court of Kansas recognizes the potential for the separation of interests in a note and related mortgage. In that context, the opinion addressed the use of the term "nominee" in some detail, as follows:
The legal status of a nominee, then, depends on the context of the relationship of the nominee to its principal. Various courts have interpreted the relationship of MERS and the lender as an agency relationship. (Citation omitted)
...
The relationship that MERS has to Sovereign is more akin to that of a straw man than to a party possessing all the rights given a buyer. A mortgage and a lender have intertwined rights that defy a clear separation of interests, especially when such a purported separation relies on ambiguous contractual language. The law generally understands that a mortgagee is not distinct from a lender: a mortgagee is "[o]ne to whom property is mortgaged: the mortgage creditor, or lender." Black's Law Dictionary 1034 (8th ed.2004). By statute, assignment of the mortgage carries with it the assignment of the debt. K.S.A. 38-2323. Although MERS asserts that, under some situations the mortgage document purports to give it the same rights as the lender, the document consistently refers only to rights of the lender, including rights to receive notice of litigation to collect payments, and to enforce the debt obligation. The document consistently limits MERS to acting "solely" as the nominee of lender.
[Id. at 166.]
While the Landmark court recognized that issues might be raised as to an alleged separation of a note and mortgage, it was not required to address those issues directly. Its analysis of the role MERS plays as nominee, however, supports the conclusion reached by this court with respect to that issue. MERS, as nominee, does not have any real interest in the underlying debt, or the mortgage which secured that debt. It acts simply as an agent or "straw man" for the lender. It is clear to this court that the provisions of the mortgage describing the mortgagee as MERS "as nominee" were not intended to deprive American Home Acceptance of its right to security under the mortgage or to separate the note and mortgage.
It is a fundamental maxim of equity that "equity looks to substance rather than form." See Applestein v. United Bd. & Carton Corp., 60 N.J.Super. 333, 348, 159 A.2d 146 (Ch.Div.) aff'd o.b., 33 N.J. 72, 161 A.2d 474 (1960). The courts have applied that principle in dealing with mortgages in a variety of contexts. *450 So it is that an assignment of a bond or note evidencing a secured obligation will operate as an assignment of the mortgage "in equity." See 29 New Jersey Practice, Law of Mortgages § 11.2, at 748 (Myron C. Weinstein) (2d ed.2001) (citing Stevenson v. Black 1 N.J.Eq. 338, 343 (Ch. 1831) and other cases). Conversely, commentators have noted the propriety of treating the assignment of a mortgage, without a specific reference to the underlying obligation, as effectively transferring both interests.
But it does not follow that an assignment in terms of the "mortgage" without express reference to the secured obligation is insufficient to transfer the obligation and is therefore a nullity, as some courts have held. As Mr. Tiffany long ago pointed out,
The question is properly one of the construction of the language used, and in arriving at the proper construction, evidence of the sense in which that language is ordinarily used is of primary importance. The expression "assignment of mortgage" is almost universally used, not only by the general public, but also by the Legislature, the courts, and the legal profession, to describe the transfer of the totality of the mortgagee's rights, that is, his right to the debt as well as to the lien securing it, and to hold, as these cases apparently do, that when one in terms assigns a mortgage, he intends, not an effective transfer of his lien alone, which is an absolute nullity, not only ignores this ordinary use of the term "mortgage", but is also in direct contravention of the well recognized rule that an instrument shall if possible be construed so as to give it a legal operation.
[29 New Jersey Practice, Law of Mortgages § 11.2 at 754 (Myron C. Weinstein) (2d ed.2001) (citing 5 Tiffany on Real Property 428-29 (1920)).]
It is apparent there was no real intention to separate the note and mortgage at the time those documents were created. American Home Acceptance remained the owner of both the note and mortgage through the date the loan was securitized. It did have the right to transfer its interests when the loan was securitized.
It was entirely appropriate to argue that the February 2009 assignment from MERS, as nominee for American Home Acceptance, to the Bank of New York as Trustee, was ineffective. From the court's perspective, that assignment was, at best, a distraction. The actual transfers of interests in the note and mortgage occurred in different ways. There was no reason, however, that plaintiff could not acquire the right to enforce the note and mortgage through those other transactions. In that context, defendant's attack on plaintiffs right to proceed based on the alleged separation of the note and mortgage is rejected.

ENFORCEMENT WITHOUT POSSESSIONTHE REAL PARTY IN INTEREST ISSUE
Plaintiff also argues that it should be permitted to proceed based on the documents presented by the time the motion was argued, without establishing that it had possession of the note. That argument is inconsistent with the provisions of the UCC dealing with the handling of negotiable instruments. Here, as in other cases, plaintiff argued that it should be permitted to proceed since it is a "real party in interest," noting that New Jersey's rules as to standing are liberal, that plaintiff has established it has some stake in the matter, and that plaintiff should therefore be permitted to proceed without the type of inquiry that would be appropriate *451 under the UCC. As is typical, plaintiffs counsel based that argument on the provisions of Rule 4:26-1, specifically arguing that under that Rule a party need only be a "real party in interest" to have standing to proceed. That argument is misplaced.
Rule 4:26-1 does not say that any individual or entity which has some interest in a matter has the authority to prosecute the claim. The Rule reads as follows:
Every action may be prosecuted in the name of the real party in interest; but an executor, administrator, guardian of a person or property, trustee of an express trust or a party with whom or in whose name a contract has been made for the benefit of another may sue in a fiduciary's own name without joining the person for whose benefit the suit is brought. A trustee of an express trust may be sued without joining the beneficiaries of the trust unless it shall affirmatively appear in the action that a conflict of interest exists between the trustee and the beneficiaries.
The very first portion of the Rule is permissive, providing that an action may be prosecuted in the name of the real party in interest. That portion of the Rule appears to contemplate that some actions may be brought in the name of someone other than the real party in interest. The next portion of the Rule provides that certain fiduciaries may bring an action in their own names, presumably on behalf of the individuals or entities for which they act, without joining those individuals or entities in the action. The Rule does not suggest that an individual or entity which does not have a fiduciary relationship with the real party in interest is authorized to bring an action on behalf of that party, whether or not that party is joined. The facts at issue here are illustrative. The complaint in this matter was filed in the name of The Bank of New York, as the Indenture Trustee. That is consistent with the Rule, assuming the action is proceeding on behalf of the Trust as the real party in interest. In essence the Rule permitted the Bank to sue in its own name, on behalf of the Trust, without joining the Trust as a party. The problem presented here, however, is more specific. Absent possession of the note, the Trust itself would not have the authority to enforce the note or the mortgage under the UCC. It would have been inappropriate for the matter to proceed in the name of the Trust or the Trustee until that issue was resolved.
Our case law dealing with the issue of standing is fairly liberal. Classically standing requires that a litigant have a sufficient stake in the matter and real adversariness, with a substantial potential for real harm flowing from the outcome of the case. See N.J. Chamber of Commerce v. N.J. Election Law Enforce. Comm'n., 82 N.J. 57, 67, 411 A.2d 168 (1980); In re N.J. Bd. Of Pub. Util., 200 N.J.Super. 544, 556, 491 A.2d 1295 (App.Div.1985). By the same token, litigants generally have no standing to assert the rights of third parties. See Jersey Shore Med. Ctr. Fitkin Hosp. v. Estate of Baum, 84 N.J. 137, 144, 417 A.2d 1003 (1980). This is an action to foreclose a mortgage, not to obtain some general determination of the rights of those involved. Obviously, there are any number of individuals and entities which have an interest in the outcome of this litigation. Presumably, that would include all those involved in the securitization of the mortgage loans at issue, including the individual investors. There is simply no reason to suggest, however, that the action to foreclose could be filed by any of the individuals or entities involved in the securitization process.
In simple terms, this was a dispute over just who has the right to enforce the note *452 and the related mortgage. That dispute could not be resolved simply by identifying those entities which had some general interest in the outcome of the litigation. It was entirely appropriate to require plaintiff to establish it did have the right to enforce the note and mortgage.

THE RIGHT TO ENFORCEMENTPOSSESSION OF THE NOTE AS OF THE DATE OF FILING
Plaintiff did produce the original note, indorsed in blank, at the time of argument on its motion for summary judgment, approximately fourteen months after the complaint was filed. It then argued that it should be permitted to proceed with the foreclosure based on its current possession of the note, without establishing it had possession as of the date the complaint was filed. That argument suggests a number of additional questions. Must plaintiff establish that it held the right to enforce the note and mortgage as of the date the complaint was filed? What should be done if plaintiff cannot establish it had the right to enforce the note and mortgage at the time the complaint is filed but can establish it had acquired that right at some subsequent time?
Obviously, a complaint to foreclose a mortgage should be filed by or on behalf of the individual or entity which has the right to enforce the mortgage at the time of the filing. That is clearly contemplated by the Rules of Court. See Rule 4:64-1(b)(10) (providing that when the plaintiff is not the original mortgagee or the original nominee mortgagee, the complaint must recite "all assignments in the chain of title.") See also Rule 4:34-3 (dealing with the substitution of parties when interests are transferred during the pendency of litigation). There are good reasons for that general rule.
For a variety of reasons, litigants facing foreclosure should be able to confirm that a complaint is properly filed by an individual or entity with the authority to proceed. The date of filing can affect substantive rights, and those involved should have the ability to confirm that filing was proper. By way of example, the Fair Foreclosure Act, N.J.S.A. 2A:50-53-72, provides that a debtor's right to cure a default with respect to a residential mortgage, without being responsible for the lender's fees and costs, will end when the complaint is filed. See N.J.S.A. 2A:50-56(c)(5), (6) and (7). Similarly, N.J.S.A. 46:10B-50 now provides that certain borrowers facing foreclosure have the right to a six month forbearance, effective with the filing of a foreclosure complaint. In any event, it is generally appropriate for one who is seeking the court's assistance in forcing the sale of property to proceed with some degree of transparency.
The issue can arise in a variety of contexts. The problem might be presented, as here, in contested litigation. Contested litigation, in turn, might involve a variety of other issues, apart from the question of standing. The problem can also arise in uncontested matters, generally handled by the Office of Foreclosure. Is it appropriate for the Office of Foreclosure to require proofs of the plaintiff's standing as of the date the original complaint was filed as a condition of recommending the entry of final judgment? More importantly, what remedy is appropriate? Should a plaintiff that did not have the authority to proceed as of the date the complaint was filed be permitted to remedy that problem by filing an amended complaint? Would the availability of that remedy depend on whether defendant had filed a responsive pleading or motion to dismiss prior to the time any amended complaint was filed? Alternatively, should the defective complaint be subject to dismissal, presumably on terms *453 permitting the filing of a new complaint by one with the authority to proceed as of the date of the new filing? Is the remedy dependent on the circumstances of the particular case at issue? Those issues are not easily resolved. While the Rules of Court do not deal with the matter directly, the courts have had occasion to address the general problem in a number of different contexts.
There is one opinion which does deal with the issue directly, in the context of foreclosure litigation filed in federal court based on diversity jurisdiction. In re Foreclosure Cases, 521 F.Supp.2d 650 (S.D.Ohio 2007) involved a dispute over standing and subject matter jurisdiction. The court concluded that to satisfy Article III's standing requirements the plaintiff in a foreclosure action must establish that it was the holder of the note and the mortgage at the time the complaint was filed. That issue was not clearly resolved on the record presented at the time. The plaintiffs were given thirty days to submit proofs that they did have standing and that the federal court had diversity jurisdiction as of the date the complaint was filed. If that was not done, the complaints at issue were to be dismissed without prejudice to refiling if and when the plaintiff acquired standing and when the diversity requirements were met. See Id. at 654. That result is consistent with this court's analysis of the issue.
There are no New Jersey cases dealing directly with the issue. There are, however, several New Jersey cases which highlight the tension presented in determining just what alternative remedy would be appropriate in these circumstances. Under the Fair Foreclosure Act, a lender which intends to foreclose a residential mortgage is required to serve what is commonly referred to as a Notice of Intention on the mortgage debtor at least thirty days before an action is filed. The borrower is given the right to cure any existing default, without the payment of the lender's fees and costs, during that interim period. See N.J.S.A. 2A:50-56 and N.J.S.A. 2A:50-57. A number of reported opinions have addressed the question of just what remedy is appropriate when some defect in service of the Notice of Intention is discovered after the complaint is filed. Generally, the question is whether the complaint should be dismissed, or whether the lender should be permitted to proceed on terms permitting the service of a new notice, to be given effect in the pending action, on terms permitting a cure as if the complaint had not yet been filed. The courts have dealt with that dispute in different ways. In GE Capital Mortgage Services, Inc. v. Weisman, 339 N.J.Super. 590, 773 A.2d 122 (Ch.Div.2000) the court permitted a lender which was unable to locate records which presumably may have established service of the Notice of Intention to cure that problem with the service of a new Notice, without the filing of a new action. The Appellate Division appears to have adopted that type of remedy in Cho Hung Bank v. Kim, 361 N.J.Super. 331, 825 A.2d 566 (App.Div.2003), a case involving apparent deficiencies within a Notice of Intention that had been served, and a dispute over whether the statute was applicable to that dispute. In that case, the Appellate Division authorized the service of a new Notice, without the dismissal of the underlying action. In EMC Mortgage Corporation v. Chaudhri, 400 N.J.Super. 126, 946 A.2d 578 (App.Div.2008), however, another panel of the Appellate Division subsequently disapproved of that remedy, essentially concluding that the underlying legislation required the dismissal of the complaint.
The opinion in Marshall v. Raritan Valley Disposal, 398 N.J.Super. 168, 940 A.2d 315 (App.Div.2008) deals with a similar *454 problem, but in an entirely different context. Marshall was a personal injury action involving multiple defendants and disputes over insurance coverage. The defendant Township of West Amwell was insured under two separate insurance policies. The Public Alliance Insurance Coverage Fund (PAIC) was one of those carriers. PAIC defended the action on behalf of West Amwell. In those proceedings, a third party action was filed by West Amwell against Illinois National, the second carrier. PAIC settled the underlying claim. Illinois National then challenged West Amwell's standing to the coverage action, essentially arguing that PAIC, and not West Amwell, was then the real party in interest. The trial court recognized that PAIC was the real party in interest, but rejected that argument that the action had to be maintained in the name of PAIC, ultimately entering judgment against Illinois National. The Appellate Division reversed, finding that West Amwell did not have standing to pursue the coverage dispute once PAIC had paid the claim. It then addressed the question of whether the third-party complaint should be dismissed, or whether the matter could proceed through the substitution of PAIC as the third-party plaintiff. The Appellate Division's analysis focused on the provisions of Rule 4:34-3, which provides that where there has been a transfer of interest, the action may proceed by or against the original party, unless the court directs a substitution. The Appellate Division permitted that matter to proceed through a substitution, but noted the court had substantial discretion in implementing the Rule. Those issues were addressed in the following language.
This view of the federal counterpart to Rule 4:34-3 could support the conclusion that the substitution of PAIC for West Amwell as third-party plaintiff is not authorized by Rule 4:34-3 because of the previously discussed differences between West Amwell's and PAIC's coverage claims against Illinois National. However, both the trial court and the parties have already invested substantial time and resources in adjudicating those claims. Moreover, both of West Amwell's and PAIC's claims derive from the same coverage provisions of the Illinois National Policy and, like its federal counterpart and the predecessor New Jersey court rule, Rule 4:34-4 vests substantial discretion in the court to determine whether substitution would be appropriate under the circumstances of a particular case. See Morris M. Schnitzer & Julius Wildstein, New Jersey Rules Service: 1954 to 1967, comment 7 on R.R. 4:38-3. Therefore, we conclude that the interests of efficient judicial administration would be served by allowing PAIC to substitute for West Amwell as the third-party plaintiff rather than requiring PAIC to file a separate action against Illinois National.
[Marshall, supra, 398 N.J.Super. at 180-181, 940 A.2d 315.]
This court is not convinced the provisions of Rule 4:34-3 were intended to apply to the circumstances presented here. The problem presented here did not relate to a transfer of interests from the plaintiff identified in the complaint to some other entity, after the complaint was filed. The issue here is whether the plaintiff identified in the complaint was the proper party at the time the complaint was filed. Nevertheless, the type of analysis suggested by the opinion in Marshall appears appropriate here. Where the plaintiff did not have the right to proceed as of the date of the initial filing, dismissal may be an appropriate remedy. The propriety of that remedy, however, will have to be addressed on a case-by-case basis. One focus *455 of any analysis would be the time and effort devoted to the prior litigation, and the amount of duplication of effort that might be required if a new action is filed, both on the part of the parties and the court.
As a routine matter, any complaint for foreclosure should be filed in the name of the individual or entity with the authority to enforce the underlying debt. In actions involving a negotiable note, plaintiff should generally be in a position to establish that it did have possession of the note as of the date the complaint was filed as required by the UCC. Where that cannot be established, the complaint may be subject to dismissal, without prejudice to the filing of a new action. There is simply no reason for this court to disregard the substantive provisions of the UCC. Equity follows the law. See Dunkin' Donuts of America Inc. v. Middletown Donut Corp., 100 N.J. 166, 183-85, 495 A.2d 66 (1985).
Whether any particular action should in fact be dismissed should be addressed on a case-to-case basis, dependent on all the circumstances. As a general matter, dismissal will probably be appropriate, if only to provide a clear incentive to plaintiffs to see that the issue of standing is properly addressed before any complaint is filed. There may be cases, however, where dismissal would not be appropriate. That may be the case if the defendant fails to raise the issue promptly, or when substantial time and effort may have been devoted to addressing other matters that would then have to be revisited in any new litigation. Those circumstances were not presented here. Defendant did raise the standing issue promptly. The parties were not required to litigate other issues. Plaintiffs right to proceed turned on plaintiffs ability to establish that it did have possession of the note at the time the original complaint was filed. That issue was ultimately addressed at trial.

TRIALPROOF OF POSSESSION, PRESUMPTIONS
Trial was conducted to address the standing issue in June 2010. Plaintiff presented the testimony of Glenn E. Mitchell, a Vice President of The Bank of New York (hereafter, The Bank) whose certification had been submitted in support of the prior motion. No other witnesses were presented by either party. Mitchell had been employed by The Bank since sometime in 2002. He had been involved in the securitization of the American Home Acceptance mortgage loans at issue. He confirmed that he did attend the closing on the loans at issue, that the closing did occur December 21, 2004, and that he was the individual who signed the documents at issue for The Bank at that closing. He was also able to identify a Mortgage Loan Schedule maintained by The Bank with respect to the particular securitization at issue, which did refer to the specific loan at issue here. He was unable, however, to confirm that the Mortgage Loan Schedule he produced would have been the same as any of the various Schedules referred to in either the Mortgage Loan Purchase Agreement, the Indenture or a separate Custodial Agreement referred to in other documentation. Indeed, the form of the Schedule did not appear to provide the information that was to be referenced in the Schedule which was to accompany the Indenture, which presumably would have been the Schedule available to The Bank. Mitchell did confirm that The Bank considered the loan at issue here to be an asset of the Trust from the time of the original securitization in 2004. He also confirmed it was an industry practice to have the documents involved reviewed over a period of months prior to any actual closing. Notably, *456 Mitchell's testimony indicated that approximately 11,000 loans had been securitized as a part of this process.
Mitchell was unable to offer any direct proof as to the physical transfer of the note at issue in this matter. The securitization documents did indicate that American Home Securities, as Seller, was to deliver a variety of documents related to individual mortgage loans to Deutsche Bank, as Custodian, which were then to be reviewed by the Custodian as a part of the securitization process. The documents to be reviewed were to include the original mortgage notes, with appropriate endorsements. It was apparently intended that the notes would be delivered to Deutsche Bank in appropriate form, and that Deutsche Bank would confirm that had been done.
Mitchell, however, was not in a position to testify as to what had actually occurred. Deutsche Bank's operations were apparently handled in a separate facility, far from Mitchell's office. Mitchell would not have been present when any documents were received or reviewed. He simply was not in a position to confirm, based on his own observations, what was done with the original note. No competent proofs were offered as to when the note was endorsed, when the note was delivered to Deutsche Bank, and whether it had been endorsed prior to that time. Indeed, there were no meaningful proofs offered as to just what had been done with the note prior to the time it was delivered to plaintiffs counsel around the time the motion for summary judgment was argued.
Plaintiff continued to argue that it was entitled to proceed with the foreclosure based on its ability to produce the note during the litigation, without establishing that it had possession as of the date of the complaint. Plaintiff also attempted to establish that the note had in fact been transferred before the complaint was filed in two separate ways. First, plaintiff offered an additional document intended to establish that Deutsche Bank, as Custodian, had received and reviewed the notes which were being securitized, and had confirmed they were in proper form, sometime on or before the closing date. That document was in the form of a letter, captioned "Form of Initial Certification," dated December 21, 2004. The letter was addressed to The Bank, American Home Servicing, and GMAC Mortgage Corporation. It referenced a Custodial Agreement and sections of the Indenture and the Mortgage Loan Purchase Agreement. (The Custodial Agreement was not provided at trial.) The letter recited that the files for each Mortgage Loan on the Mortgage Loan Schedule had been reviewed, that the documents required were in the Custodian's possession and that the documents "appear to be regular on their face," except as referenced on an exception report. (There were several additional documents attached to the letter, including one document captioned Exception Report Summary. While there was no specific reference to the loan at issue here in that document, the document itself was difficult to understand. It appears to list thousands of "exceptions" without relating those exceptions to specific loans.) The letter was signed by one Andrew Hays, referred to simply as an "Associate" of Deutsche Bank. It did not indicate whether Hays himself had reviewed any portion of the 11,000 files that would have been at issue, or how he would have obtained information as to reviews conducted by other individuals. The letter was obviously intended to establish the truth of the matters stated. Plaintiff was unable to establish that it could be admitted into evidence as a business record. See N.J.R.E. 803(c)(6). Its contents have not been considered as a part of this analysis.
*457 Second, plaintiff argued that under the circumstances presented it was entitled to a presumption that it was in possession of the note at the time the complaint was filed, based on its ability to produce the original note at the time of argument and trial. That argument was based on Dolin v. Darnall, 115 N.J.L. 508, 181 A. 201 (E. & A.1935), which in turn cited Hovey v. Sebring, 24 Mich. 232 (1872). Those cases can be cited for the proposition that the production of a note at the time of trial raises the presumption that plaintiff was authorized to prosecute the matter at the time suit was filed. This court, however, was not convinced that plaintiff was entitled to the type of presumption suggested under the facts presented here or that the presumption, if available, would resolve the issue. The opinions in both Dolin and Hovey acknowledge that the person attempting to enforce the provisions of a note must generally be in possession of the note as of the date the action to collect is filed. In Dolin, supra, 115 N.J.L. at 510, 181 A. 201, the payee on two promissory notes had received payment. The dispute presented was whether the payment was intended to satisfy the notes, or whether the individual who had made the payment had simply purchased the notes, intending to pursue the right to collection. Ibid. It was stipulated at trial that the plaintiff did not have possession of the notes until long after the case was filed. Id. at 511, 181 A. 201. The opinion deals with the question of whether the plaintiff could be considered a "holder" or a "bearer" as of the time the complaint was filed, pursuant to the Uniform Negotiable Instruments Act in effect at the time. It was determined that plaintiff could not proceed. Id. at 510, 181 A. 201. The case was dismissed by the trial court and the Court of Errors and Appeals affirmed. Id. at 516, 181 A. 201. Any presumption that may have arisen from the production of the notes at trial was of no moment to the ultimate result. Hovey, supra, at 232 addressed the question of whether the maker of the note at issue should be permitted to challenge the plaintiff's right to proceed at trial. The plaintiff had testified that he was the "owner" of the note. Id. at 234. The trial court did not permit the defendant to question the plaintiff about that claim. Ibid. The Supreme Court of Michigan concluded that the trial court erred and reversed. Ibid. Again, any presumption that may have existed was of no moment. Indeed, the holding in Hovey does suggest that a defendant who challenges a plaintiffs standing may present that challenge by attacking the plaintiffs proofs.
The opinion in Dolin refers to Hovey as "the leading and frequently cited case," reproducing the following passage from that opinion:
It is well settled, as a general rule, that the possession of such note by the plaintiff producing it on the trial, is prima facie evidence of his title, or his right to sue upon it, and that the plaintiff need not be the real or beneficial owner to entitle him to recover. And liberal as the law is to the person in whose name the suit may be brought, and in presuming ownership from possession, we think it has not gone, and ought not to go, so far as to allow a party to bring an action before his right of action has accrued: and whatever may be the state of facts which authorizes the suit to be brought in the name of any particular person, must, as a general rule, exist at the time the suit is instituted in his name. This, it is true would, in ordinary cases, be presumed from the production of the note by the plaintiff on the trial but the defendant, we think, may rebut this presumption, and defeat the action by showing that the state of facts existing at the time of the institution of the *458 suit not authorize the plaintiff to sue. The plaintiff can only recover upon the cause of action he had at the institution of his suit, and he is not allowed to sue first and obtain his cause of action afterwards.

[Dolin, supra, 115 N.J.L. at 514-15, 181 A. 201 (emphasis added).]
There are different types of presumptions. Logical presumptions depend for their validity on the fact that there is an empirically demonstrable probability that, as a matter of common experience, the presumed fact flows from the underlying fact. Artificial presumptions, on the other hand, may be based on considerations of public policy. See Lionshead Woods v. Kaplan Bros., 243 N.J.Super. 678, 682-83, 581 A.2d 137 (Law Div. 1990). Courts are generally reluctant to create presumptions. See Avemco Ins. Co. v. U.S. Fire Ins. Co., 212 N.J.Super. 38, 46, 513 A.2d 962 (App.Div.1986). Presumptions may also become outdated as the law changes. See Troy v. Rutgers, 168 N.J. 354, 365-66, 774 A.2d 476 (2001).
Both Dolin and Hovey suggest there are substantial limits to any presumption that might arise out of a plaintiff's ability to establish his possession of a note sometime after a complaint has been filed. Each opinion recognizes that the presumption would be available "in ordinary cases." Each also recognizes the more basic principal involvedthat one seeking to enforce a note should be in possession as of the date the action is filed. Notably, neither case involved the type of relief requested here, involving a request for foreclosure. In any event, it would be difficult to conclude that this is an "ordinary" case, as that term was used in those prior opinions. More generally, it would be difficult to conclude that the presumption suggested should be available in cases involving the securitization of mortgage loans with all the complexity attendant on that process. In any event, this court was not convinced the presumption at issue should be applied to limit defendant's ability to challenge plaintiffs standing. To the contrary, given the circumstances presented here, this court was satisfied it was generally appropriate to require plaintiff to establish that it did have possession of the note as of the date the complaint was filed. Given all the circumstances, that does not appear to be an unreasonable burden to impose on a plaintiff requesting the equitable remedy of foreclosure, to force the sale of a defendant's property to obtain payment of a debt.
The inapplicability of the presumption sought by plaintiff does not resolve the factual issue presented at trial considering all the proofs, was plaintiff able to establish that it did have possession of the note at the time the complaint was filed? As noted, plaintiff was not able to offer any direct proofs on that issue. Each party, however, argued that the issue should be resolved in its or his favor based on a number of conflicting inferences suggested by the specific proofs and the general circumstances presented. Plaintiff's arguments focused on the documents created as a part of the securitization process. Those documents were admitted into evidence at trial, based on Mitchell's testimony. While plaintiff was never able to present the Mortgage Loan Schedule that should have been attached to the Mortgage Loan Purchase Agreement, it was able to present a separate schedule maintained by the Bank, which did refer to defendant's loan. From all the proofs presented, the court was satisfied that defendant's loan was among the loans which were securitized in 2004. The securitization documents did provide that the Custodian was to review the files for each mortgage loan, to confirm that each *459 file contained the documents required, including the original note for each loan. From those circumstances, plaintiff argued the court could infer that the review occurred sometime in or around 2004 or 2005, that the file for defendant's loan was included in that review, and that the Custodian must then have located the original note in the file, appropriately endorsed. That inference is not illogical. It was considered.
Defendant offered other arguments, suggesting the proofs presented by plaintiff were suspect, and that other contradictory inferences would be appropriate. Given all the circumstances presented, it was entirely appropriate to question the reliability of the materials submitted by plaintiff. The provisions of plaintiffs original complaint referring to the plaintiff as having become the owner of the note and mortgage "before the complaint was filed" did not comply with the provision of Rule 4:64-1(b)(10) and was arguably evasive. The MERS assignment was potentially misleading. Plaintiff was never able to explain, in any meaningful way, why it was unable to locate the Mortgage Loan Schedule that should have been attached to the Mortgage Loan Purchase Agreement, or why it had taken so long to respond the court's prior requests for the production of documents. Plaintiff was clearly on notice that the court intended to address the question of whether it had possession of the note as of the date the complaint was filed at trial, but was unable to produce any meaningful proof on the issue. Plaintiff failed to present a witness from the Custodian, or even an appropriate business record that might have been maintained by the Custodian to confirm just what had occurred when the mortgage loan files were to be reviewed. There was also no explanation of just how plaintiffs counsel had come into possession of the original note. In the absence of such proofs, defendant argued, the court could infer that the review contemplated by the securitization process had not occurred, or that plaintiff was simply unable to establish that it had. Those potential inferences were also logical, and were considered.
This was a factual dispute. Plaintiff was required to establish one basic factthat as of the time the complaint was filed, it or its agent did have possession of the note on which the action was based. This court was satisfied the burden of proof on that issue rested with plaintiff, and the plaintiff was required to carry that burden by the preponderance of the evidence. Having considered all the evidence presented, as well as the inferences argued, the court was satisfied that the proofs on that issue were in equipoise. Plaintiff failed to convince the court, even by the preponderance of the evidence standard, that it did have possession of the note as of the date the complaint was filed. Accordingly, the complaint has been dismissed without prejudice to plaintiffs right to institute a new action, provided that any new complaint must be accompanied by a certification confirming that plaintiff is then in possession of the original note.

CONCLUSION
Defendant's attack on plaintiff's ability to proceed with the foreclosure based on the alleged "separation" of the note and mortgage was rejected. Plaintiff, however, failed to establish that it was entitled to enforce the note as of the time the complaint was filed. In this case, there are no compelling reasons to permit plaintiff to proceed in this action. Accordingly, the complaint has been dismissed. That dismissal is without prejudice to plaintiff's right to institute a new action to foreclose at any time, provided that any new complaint *460 must be accompanied by an appropriate certification, executed by one with personal knowledge of the circumstances, confirming that plaintiff is in possession of the original note as of the date any new action is filed. That certification must indicate the physical location of the note and the name of the individual or entity in possession.