**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-5334-16T1

THE BANK OF NEW YORK
MELLON, f/k/a THE BANK OF
NEW YORK, AS TRUSTEE
(CWALT 2006-36T2),

      Plaintiff-Appellant,

v.

MARIANNE CORRADETTI and
ANTHONY CORRADETTI, h/w,

      Defendants-Respondents,

and

STATE OF NEW JERSEY,

      Defendant.

_____

Argued October 17, 2018 – Decided January 6, 2020

Before Judges Fuentes, Accurso and Vernoia
(Judge Accurso dissenting).

On appeal from the Superior Court of New Jersey,
Chancery Division, Cape May County, Docket No. F-
053052-14.

Michael R. O'Donnell argued the cause for appellant (Riker Danzig Scherer Hyland & Perretti, LLP, and KML Law Group, PC, attorneys; Michael R. O'Donnell, of counsel; Ronald Z. Ahrens and Clarissa Anne Gomez, on the briefs).

Randolph C. Lafferty argued the cause for respondents (Cooper Levenson PA, attorneys; Randolph C. Lafferty, Yolanda N. Melville, and Jennifer Broeck Barr, on the brief).

The opinion of the court was delivered by

VERNOIA, J.A.D.

In this mortgage foreclosure action, plaintiff Bank of New York Mellon f/k/a The Bank of New York, as Trustee (CWALT 2006-36T2), appeals from Chancery Division orders denying its motions for summary judgment and reconsideration, and from a July 26, 2017 amended final judgment entered after a bench trial in favor of defendants Marianne and Anthony Corradetti dismissing the complaint and invalidating and extinguishing plaintiff's purported $1,779,000 mortgage on defendants' Ocean City property. We affirm in part and remand in part.

I.

In 1992, defendants, who are husband and wife, purchased residential property in Ocean City for $525,000. They executed a purchase money

mortgage in favor of New Jersey National Bank to secure a $400,000 loan. The mortgage was canceled on January 25, 1994.

In 2000, defendants mortgaged the property to Commerce Bank to secure a $2,300,000 loan. Three years later, defendants gave mortgages on the property to World Savings Bank (WSB) to secure a $500,000 loan and to Commerce Bank to secure a $2,300,000 loan. The Commerce Bank mortgage from 2000 was then canceled.

The purported transaction at the center of this appeal took place in September 2006. A $1,779,000 promissory note in favor of plaintiff's predecessor in interest, Countrywide Home Loans, Inc. (Countrywide), was allegedly signed by defendant Marianne Corradetti on September 25, 2006. A mortgage was allegedly signed by defendants that same day in favor of Countrywide to secure the putative $1,779,000 loan to Marianne Corradetti.[1] Defendants' purported signatures on the mortgage are notarized by "Robert A. Citarelli" on "September 25, 2006."

A HUD-1 Settlement Statement allegedly prepared in connection with the transaction reflects a September 25, 2006 settlement date for the closing and contains defendants' purported signatures, each of which is followed by a

---

[1] The mortgage was recorded with the Cape May County Clerk on October 3, 2006.

handwritten date of September 25, 2006. The HUD-1 statement indicates defendants were required to pay $8840.26 at the loan closing. The HUD-1 statement further reflects that proceeds from the loan were remitted by Countrywide's settlement agent, Boardwalk Title Agency, Inc., to pay the balances due on defendants' 2003 loans from WSB ($407,000) and Commerce Bank ($1,352,059.25), as well as local and state taxes.

Three weeks after the purported mortgage loan transaction, WSB acknowledged it received "full payment and satisfaction" of its 2003 mortgage on defendants' property and discharged the mortgage. The discharge of WSB's mortgage was recorded on October 20, 2006.

Two weeks later, on November 6, 2006, Commerce Bank filed a discharge of its 2003 mortgage on defendants' property. The discharge states the 2003 mortgage was "fully paid and satisfied."

Plaintiff filed a foreclosure complaint in 2014 alleging it is the successor in interest to Countrywide by assignment.[2] The complaint alleged defendant

---

[2] The 2006 mortgage was assigned on behalf of Countrywide to the Bank of New York Mellon f/k/a The Bank of New York as Trustee for the Benefit of the Certificate Holders of the CWALT, Inc., Alternative Loan Trust 2006-36T2, Mortgage Pass Through Certificates, Series 2006-36T2. The assignment of mortgage was recorded on November 17, 2009. The mortgage was then assigned to plaintiff by way of an assignment of mortgage recorded on February 14, 2014. The assignment of the mortgage to plaintiff occurred prior
(continued)

Marianne Corradetti received a $1,779,000 loan from Countrywide and executed a promissory note in that amount in Countrywide's favor on September 25, 2006. The complaint further asserted defendants granted Countrywide a mortgage on their Ocean City property to secure payment of the note. The complaint averred defendants failed to make an installment payment that was due on April 1, 2009, and remained in default thereafter.

Defendants filed a contesting answer which, in pertinent part, denied that Marianne Corradetti signed the promissory note and that defendants signed the mortgage. Defendants asserted the "signatures on the mortgage and note are forgeries and not the signatures of Marianne Corradetti and Anthony Corradetti."

In 2015, plaintiff filed an amended complaint adding claims against defendants for equitable subrogation, an equitable lien and unjust enrichment. Defendants filed a contesting answer to the amended complaint, again asserting the signatures on the note and mortgage were forgeries. Defendants

---

(continued)
to the filing of the foreclosure complaint, and plaintiff possessed the promissory note when the complaint was filed.

A-5334-16T1

also filed a third-party complaint against Boardwalk Title Agency, Inc., and Robert A. Citarelli.[3]

Plaintiff subsequently filed a motion for summary judgment. In support of the motion, plaintiff presented a statement of material facts asserting Marianne Corradetti signed the 2006 promissory note to Countrywide, both defendants signed the mortgage, and defendants defaulted on April 1, 2009. Plaintiff further asserted the HUD-1 statement showed portions of the loan proceeds would be used to pay the 2003 WSB and Commerce Bank loans, and the mortgages securing those loans were discharged within six weeks of the September 25, 2006 loan transaction. Plaintiff relied on exemplars of defendants' purported signatures on various documents, Marianne Corradetti's deposition testimony about the signatures, and a report from an expert forensic document examiner who opined, within a reasonable degree of scientific certainty, that the signatures on the 2006 note and mortgage to Countrywide were defendants'.

---

[3] In August 2015, plaintiff filed a second amended complaint adding Boardwalk Title Agency, Inc., and Robert A. Citarelli as defendants and asserting separate claims against them. There is no evidence in the record on appeal that they were served with defendant's third-party complaint or plaintiff's second amended complaint. They did not participate in the proceedings before the trial court and have not entered an appearance in this appeal.

Defendants submitted opposition to plaintiff's motion and filed a cross-motion for summary judgment, claiming they were entitled to dismissal of the foreclosure complaint because the evidence established their signatures on the documents were forgeries and the note and mortgage were therefore invalid. Defendants produced evidence showing they were on a religious pilgrimage in Croatia on September 25, 2006—the date the Countrywide loan and mortgage allegedly closed and the HUD-1 was signed—and did not return to the United States until September 26, 2006. Marianne Corradetti asserted the signatures on the HUD-1 and note, dated September 25, 2006, and on the mortgage, which was notarized on September 25, 2006, could not be hers or her husband's because they were in Croatia on that date.

Defendants admitted the HUD-1 "reflects" that proceeds from the disputed loan were "allegedly used" to pay off the WSB and Commerce Bank loans and taxes defendants owed to the Ocean County Tax Collector and the New Jersey Division of Taxation, but denied signing the HUD-1. Defendants further admitted the WSB mortgage was discharged in October 2006 and the Commerce Bank mortgage was discharged in November 2006, but denied they were aware "that any payment was made to" either WSB or Commerce Bank by Countrywide during 2006.

Defendants also submitted a certification from a physician explaining that Anthony Corradetti could not provide any information concerning the facts pertinent to the matter because he suffers from Alzheimer's disease.

After hearing oral argument, the court issued a written opinion explaining plaintiff's foreclosure action is based on a mortgage and note that were purportedly executed on September 25, 2006, but defendants produced evidence showing they could not have executed the documents on that date because they were in Croatia. The court rejected plaintiff's reliance on a certification from a representative of Bayview Loan Servicing, LLC (Bayview), the company plaintiff used to service its mortgage loans. The certification incorporated computer records obtained from Countrywide's loan servicing provider, Bank of America, that showed thirty payments were made on the loan from November 2006 through March 2009. Plaintiff claimed the payments confirmed defendants executed the note and mortgage or otherwise established defendants ratified the note and mortgage. The court rejected plaintiff's reliance on the certification and records, finding neither stated nor established defendants made any of the payments.

The court denied plaintiff's motion and defendants' cross-motion for summary judgment, finding there was a genuine issue of material fact as to whether defendants executed the note and mortgage and, therefore, whether the

A-5334-16T1

documents were valid. The court denied defendants' summary judgment motion, finding that when the facts were viewed in the light most favorable to plaintiff, there was evidence supporting plaintiff's claim defendants signed the documents. The court also found, because there were genuine issues of material fact as to whether the purported mortgage was valid and whether the purported mortgage proceeds were used to pay off defendants' existing mortgages, it could not grant plaintiff's motion for summary judgment on its mortgage foreclosure, equitable subrogation, equitable lien and unjust enrichment claims. The court entered a December 14, 2016 order denying plaintiff's summary judgment motion and defendants' cross-motion.

Plaintiff filed a motion for reconsideration, arguing the court erred by denying summary judgment on its equitable subrogation claim. Plaintiff supplied the court with an unpublished Appellate Division decision that plaintiff asserted permitted application of equitable subrogation under the circumstances presented here. The court concluded the doctrine of equitable subrogation does not convert an invalid mortgage into a valid mortgage, and there was a genuine issue of material fact as to whether the September 25, 2006 mortgage is valid. The court also reasoned that if plaintiff established the September 25, 2006 mortgage is valid, application of equitable subrogation would be unnecessary because plaintiff would have a first mortgage on

9

defendants' property and would be able to proceed with the foreclosure. The court entered a February 3, 2017 order denying the reconsideration motion.

At the bench trial that followed, plaintiff presented a single witness in support of its foreclosure, equitable mortgage, equitable subrogation, and unjust enrichment claims. James D'Orlando testified he is a litigation manager at Bayview. He explained Bayview's practice of conducting a 132-point data check to verify the information contained in the loan and mortgage documents supplied by the prior loan service provider before Bayview's assumption of the servicing of the loan, and testified this process was followed when Bayview took over the servicing of the purported 2006 loan from Bank of America in October 2012. However, D'Orlando conceded he had no personal knowledge regarding the purported September 25, 2006 mortgage transaction or the data check performed on the 2006 loan documents, and was not involved in the processing of the loan and mortgage, never spoke to anyone concerning the transaction and had no knowledge of whether defendants actually signed the note, mortgage, HUD-1 statement or any other documents related to the mortgage loan. His knowledge was limited to his review of Bayview's records pertaining to the mortgage and the records Bayview received from Bank of America.

D'Orlando's substantive testimony was limited to his identification of documents in Bayview's loan serving file: the original September 25, 2006 Countrywide note, which contains Marianne Corradetti's purported signature; the September 25, 2006 mortgage, which lists defendants as the borrowers and includes their purported signatures; a September 25, 2006 HUD-1 statement which bears defendants' purported signatures; Bank of America's letter to Corradetti and enclosed list of thirty payments on the loan from October 2, 2006, through April 30, 2010, as well as other taxes and fees (the payment history); the "BAC Fee Transaction Histories Prior to Bayview," a list of 201 transactions from October 20, 2010, through October 2, 2012; a one-page untitled document containing fifteen transactions of a similar nature to, but different from those in, the "BAC Fee Transaction Histories Prior to Bayview" from April 19, 2011, through October 15, 2012; and the "Bayview Customer Activity Statement," which lists taxes, fees, and insurance premiums paid on defendants' property from October 25, 2012, through May 19, 2017. D'Orlando further explained the September 25, 2006 loan closing was for a mortgage refinance.

The court admitted the documents in evidence, as well as others related to defendants' 1992 purchase of the Ocean City property, including the cancellation of the original purchase money mortgage, the subsequent 2000

mortgage to Commerce Bank and its cancellation in 2003, and the 2003 mortgages to WSB and Commerce Bank and their cancellations during the six-week period following the purported September 25, 2006 loan and mortgage closing.

The court also admitted in evidence a November 2, 2009 foreclosure complaint plaintiff filed against defendants, which was subsequently "voluntarily dismissed," plaintiff's motion for entry of a final judgment of foreclosure in that matter,[4] and a letter allegedly submitted by defendants in response to plaintiff's request for final judgment in that matter. The letter stated, "You are hereby notified that I object to the entry of a final judgment in the above referenced matter[.] I disagree and dispute the amount that you show as amount owed." The letter bears defendants' purported signatures.

Plaintiff rested without calling any other witnesses or presenting any other evidence. Although in support of its summary judgment motion plaintiff provided an expert report opining that the disputed signatures on the loan and mortgage closing documents were defendants', it did not present any expert or lay opinion testimony at trial concerning the signatures on any of the documents admitted in evidence. In addition, although the court noted in its

---

[4] The circumstances of that filing and subsequent voluntary dismissal are unclear from the record.

decision denying summary judgment that there was no evidence establishing defendants made any of the purported thirty loan payments from November 2006 through March 2009 reflected in the payment history, plaintiff failed to present any evidence at trial showing defendants made any of the thirty payments on the loan or paid the $8840.26 due and owing at the September 25, 2006 closing as indicated on the HUD-1 statement.[5]  Nor did plaintiff produce records from WSB or Commerce Bank showing the source of the 2006 payments that satisfied defendants' 2003 mortgages, the amounts of the payments that were accepted in satisfaction of those mortgages or that the payments were made by Countrywide or its settlement agent, Boardwalk Title Agency, Inc.[6]

The defense called defendant Marianne Corradetti as its sole witness. She testified that she and her husband attended a religious pilgrimage in

---

[5]  For example, plaintiff did not present bank records from defendants' accounts showing they made any of the purported mortgage payments.  The HUD-1 statement, which the court found was forged, indicated that $8840.26 was due and owing from defendants at the September 25, 2006 closing, but plaintiff did not present any evidence from defendants' bank records showing they ever made such a payment.

[6]  Our dissenting colleague correctly points out that the record presented in support of plaintiff's summary judgment motion included other putative evidence related to the mortgages, see post at 1, n.1, and 9, n.7.  But that evidence was not introduced at trial and cannot be properly considered in assessing the validity of the trial court's fact findings.

13

Croatia from September 18, 2006, through September 26, 2006. She further identified her and her husband's passports, which showed they were not in the United States on September 25, 2006, when the purported loan and mortgage closing took place, and that they did not return until September 26, 2006. A copy of defendants' itinerary for the 2006 Croatia trip, their passports and photographs of defendants on the trip were admitted in evidence.

Marianne Corradetti denied the signatures on the loan and mortgage documents were hers or her husband's and testified that she never authorized anyone to sign them on her behalf.[7] She stated she never dealt with Countrywide, never granted Countrywide a mortgage on the Ocean City property, and "would have never" agreed to place a mortgage on the property because it was her "dream house." She further testified that her husband told her they were "free and clear" of any mortgage, and she was "unaware that [the property] was mortgaged."

Marianne Corradetti testified that her husband handled the family's finances and business dealings without her involvement. She denied making any of the mortgage payments reflected in the Bank of America payment

---

[7] At times, Marianne Corradetti gave conflicting testimony concerning the authenticity of her and her husband's purported signatures on various documents shown to her.

history or otherwise writing checks toward any mortgage payments for the property. She was aware of the $2,300,000 mortgage made to Commerce Bank in 2000, but had no knowledge as to how it was paid.

The court subsequently issued a detailed written decision finding D'Orlando provided no information "based on his own knowledge with regard to the closing" and provided only "the minimum testimony necessary to get the records into evidence pursuant to the business records exception" to the hearsay rule. See N.J.R.E. 803(c)(6). The court explained D'Orlando's testimony was imprecise—at times he testified Bayview did a 130-point data check, and at others he referred to it as a 132-point data check—and found D'Orlando's testimony beyond "what records are in the Bayview file" was not credible because it was not based on his personal knowledge.[8]

Persuaded by the evidence showing defendants did not return to the United States until September 26, 2006, the court found credible Marianne Corradetti's testimony that she and her husband did not sign the September 25, 2006 note, mortgage and HUD-1 statement. The court concluded the mortgage documents were forgeries and noted plaintiff did not present any credible

---

[8] For example, D'Orlando testified defendants made the thirty loan payments reflected in the Bayview records. That information, however, is not contained in the Bank of America records. Those records do not identify the source of the payments.

evidence establishing that defendants signed the mortgage, note and HUD-1 "on any day other than September 25, 2006," the notary public was "negligent or unscrupulous," or "defendants authorized someone else to sign their names for them, to act as their amanuensis." The court also found credible Marianne Corradetti's testimony that she believed the property was "free and clear" of any mortgage, "she had no knowledge of the subject mortgage . . . never dealt with Countrywide, and . . . never was aware of any prior foreclosure."

The court determined "defendants . . . provided clear, satisfactory and convincing evidence to overcome any presumption of authenticity offered by the notarial seal" in the mortgage documents. The court further found it was "enough that defendants show[ed] by clear and convincing evidence that they did not sign the documents to be relieved of the obligations of the" mortgage, concluded the legal effect of the forgeries invalidated the mortgage, and declared the mortgage "void ab initio, canceled, or extinguished."

The court also concluded plaintiff failed to present any credible evidence establishing an agreement between defendants and Countrywide. The court rejected plaintiff's argument "that the payment history" for the 2006 loan establishes "a ratification of the mortgage" and "an agreement between Countrywide and defendants" and found plaintiff failed to produce any credible evidence showing defendants actually made the purported payments

16

reflected in the payment history. The court rejected D'Orlando's testimony regarding the payment history as "not convincing, and . . . not credible" because D'Orlando "never testified how payments were verified, the payment dates, the number of payments and amount of payments that were made on" the mortgage, "could not testify to the information contained in the document," and provided conclusory testimony that the information contained in the document was true. The court reasoned that whoever forged the mortgage documents may have made the payments to cover up their forgeries, and plaintiff failed to present any evidence showing defendants actually made any payments. The only documents plaintiff presented that the court found reliable were those in Bayview's file showing taxes, fees, and insurance premiums paid on defendant's property following the purported default.

Moreover, the court found plaintiff failed to present any evidence the September 25, 2006 mortgage loan proceeds were actually "used to satisfy the [WSB] and Commerce Bank mortgages." The court found the filed satisfactions of the mortgages constituted "evidence that the two mortgages were satisfied," but not by whom. The court observed that plaintiff did not produce the original WSB mortgage, and the only evidence concerning WSB is a recorded satisfaction of the mortgage that does not include any reference to Countrywide, Bayview or a payoff amount. Similarly, the court noted the

17

Commerce Bank satisfaction makes no mention of Countrywide or Boardwalk Title Agency, Inc. The court rejected the HUD-1 statement as persuasive evidence establishing the loan proceeds were used to pay the WSB and Commerce Bank mortgages because "it too contains a forged signature and it too is an invalid document."

The court also rejected plaintiff's reliance on the November 2, 2009 letter purportedly sent by defendants in response to plaintiff's request for entry of a final judgment in the 2009 foreclosure action. Plaintiff argued the letter only disputed the amount due claimed by plaintiff in the foreclosure action and thus constituted an admission plaintiff had a valid mortgage on the property. The court found that the letter, even if written by defendants, disputed not only the amount allegedly due but also challenged entry of a final judgment and therefore contested plaintiff's right to foreclose.

The court further rejected plaintiff's argument supporting the existence of a mortgage under equitable doctrines, finding there was no evidence of ratification and that the doctrines of waiver, equitable estoppel, and equitable subrogation did not apply. The court found plaintiff erroneously attempted "to use equitable subrogation to transform an invalid mortgage into a valid mortgage." The court further observed that "no New Jersey case has applied equitable subrogation where the adverse party is the fee simple owner of the"

18

property at issue. The court declined to create an equitable mortgage because "there is no evidence of an agreement between defendants and Countrywide."

Last, the court declined to find defendants were unjustly enriched because plaintiff did not present "evidence [establishing] that Countrywide money was used to satisfy the [Commerce Bank and WSB] mortgages." The court held that without credible evidence the proceeds from the purported September 25, 2006 transaction were used to satisfy the two mortgages, there is no basis to conclude defendants received a benefit from plaintiff or plaintiff's predecessor. The court found the HUD-1 signatures were forged, and, therefore, the HUD-1 statement is invalid and did not establish any proceeds were used to satisfy the mortgages. Plaintiff presented no other credible evidence the loan proceeds were actually used to satisfy the mortgages.

The court determined "[l]enders have an obligation to do everything correctly because their remedy has significant consequences to real people; their remedy is ultimately to take someone's home." The court concluded that plaintiff "failed to exercise due diligence" and had "bad paper: an invalid mortgage, an invalid note, and an invalid HUD-1."

The court entered a June 30, 2017 order granting judgment in defendants' favor and dismissing plaintiff's complaint. The court then filed an

A-5334-16T1

amended order dated July 26, 2017, entering judgment in favor of defendants and invalidating the September 2006 Countrywide mortgage and note. This appeal followed.

II.

Plaintiff first argues the court erred by denying its motions for summary judgment and reconsideration. More specifically, it contends the undisputed facts presented in support of its summary judgment motion established it is entitled to a lien on defendants' property under the doctrine of equitable subrogation because the proceeds from the September 25, 2006 mortgage loan transaction were used to pay the balances due under the 2003 WSB and Commerce Bank mortgage loans. Plaintiff contends the court erred by finding the doctrine is not applicable where loan funds are paid from an allegedly invalid mortgage loan and cannot be applied against a fee simple ownership interest.

We review a grant or denial of summary judgment de novo and apply the same standard as the trial court. See State v. Perini Corp., 221 N.J. 412, 425 (2015). We "must view the facts in the light most favorable to the non-moving party, which in this case" is defendants. Bauer v. Nesbitt, 198 N.J. 601, 605 n.1 (2009). The moving party must show there is "no genuine issue as to any material fact challenged and that [it] . . . is entitled to a judgment . . . as a

matter of law." Burnett v. Gloucester Cty. Bd. of Chosen Freeholders, 409 N.J. Super. 219, 228 (App. Div. 2009) (quoting R. 4:46-2(c)). Measured against these well-established principles, we affirm the court's denial of plaintiff's summary judgment motion on its equitable subrogation claim.

Under the doctrine of equitable subrogation, "[a] refinancing lender whose security turns out to be defective is subrogated by equitable assignment 'to the position of the lender whose lien is discharged by the proceeds of the later loan, there being no prejudice to or justified reliance by a party in adverse interest[.]'" Equity Sav. & Loan Ass'n v. Chi. Title Ins. Co., 190 N.J. Super. 340, 342 (App. Div. 1983) (emphasis added) (citation omitted). Thus, to succeed under the doctrine of equitable subrogation, the refinancing lender must establish that the proceeds of its loan were used to satisfy the lien of the prior lienholder. Ibid.

Here, the motion court correctly denied plaintiff's summary judgment motion on its equitable subrogation claim because there was a genuine issue of material fact as to whether the proceeds from the September 25, 2006 mortgage loan were used to satisfy the WSB and Commerce Bank mortgage loans. Plaintiff did not present any direct evidence showing that funds from the purported September 25, 2006 transaction were used to satisfy the WSB and Commerce Bank mortgage loans. Instead, plaintiff relied on the HUD-1

21

statement to establish the mortgage loan proceeds were used to satisfy those loans. But defendants presented evidence establishing they did not sign the HUD-1 statement; they were out of the country and otherwise challenged the authenticity of the signatures.[9]

Similarly, plaintiff relied on the cancellation of the WSB and Commerce Bank mortgages within weeks of the purported September 25, 2006 transaction to support its claim it was entitled to summary judgment on its equitable subrogation claim. But again defendants denied their participation in the transaction, and plaintiff failed to present competent evidence showing that as a matter of undisputed fact the proceeds from the transaction were actually used to satisfy the WSB and Commerce Bank mortgage loans.

Although plaintiff presented evidence of many circumstances supporting its claim the proceeds were used to satisfy the prior mortgage loans, resolution of the issue depended upon a weighing of the evidence and a determination of the credibility of the parties' respective evidence and testimony. "In reviewing whether or not a genuine issue as to any material fact challenged is presented, the motion judge cannot weigh the credibility of the evidence." Petersen v.

---

[9] Marianne Corradetti testified at her deposition that she did not recall signing the HUD-1 statement and did not recognize her husband's signature on the statement. She also testified she was "unsure" if she "recognized" her purported signature "to be [her] signature."

22

Twp. of Raritan, 418 N.J. Super. 125, 132 (App. Div. 2011). Thus, the validity of the HUD-1 statement and its credibility as an accurate statement of the disposition of the mortgage loan proceeds presented fact issues essential to a resolution of plaintiff's claimed entitlement to equitable subrogation, and the motion court therefore correctly denied plaintiff's motion for summary judgment on its equitable subrogation claim,[10] as well as its subsequent motion for reconsideration.

## III.

Plaintiff also challenges the court's orders, entered after the bench trial, dismissing its claims and complaint and declaring the purported Countrywide note and mortgage void and invalid. Plaintiff contends the court's decision is not supported by substantial credible evidence, is contrary to the credible evidence presented and results in a manifest injustice. We are not persuaded.

Our review of "the findings and conclusions of a trial court following a bench trial are well-established." Allstate Ins. Co. v. Northfield Med. Ctr., P.C., 228 N.J. 596, 619 (2017). We do not "engage in an independent

---

[10] Because the motion court correctly determined there was a genuine issue of material fact as to one of the essential elements of plaintiff's equitable subrogation claim—the refinancing lender's payment of an existing lien—it is unnecessary to address plaintiff's argument that the court erred by also finding the doctrine of equitable subrogation has no application against a fee simple owner or where loan funds are secured by an invalid mortgage.

assessment of the evidence as if [we] were the court of first instance," State v.

Locurto, 157 N.J. 463, 471 (1999), and will "not weigh the evidence, assess

the credibility of witnesses, or make conclusions about the evidence,"

Mountain Hill, L.L.C. v. Twp. of Middletown, 399 N.J. Super. 486, 498 (App.

Div. 2008) (quoting State v. Barone, 147 N.J. 599, 615 (1997)).  Instead,

> [w]e give deference to the trial court that heard the
> witnesses, sifted the competing evidence, and made
> reasoned conclusions. Reviewing appellate courts
> should "not disturb the factual findings and legal
> conclusions of the trial judge" unless convinced that
> those findings and conclusions were "so manifestly
> unsupported by or inconsistent with the competent,
> relevant and reasonably credible evidence as to offend
> the interests of justice."
>
> [Allstate Ins. Co., 228 N.J. at 619 (alteration in
> original) (citations omitted) (quoting Griepenburg v.
> Twp. of Ocean, 220 N.J. 239, 254 (2015)).]

"[W]e defer to the trial court's credibility determinations, because it

'"hears the case, sees and observes the witnesses, and hears them testify,"

affording it "a better perspective than a reviewing court in evaluating the

veracity of a witness."'"  City Council of Orange Twp. v. Edwards, 455 N.J.

Super. 261, 272 (App. Div. 2018) (quoting Gnall v. Gnall, 222 N.J. 414, 428

(2015)).  We will not disturb a trial court's findings "unless they are so clearly

insupportable as to result in their denial of justice."  Estate of Ostlund v.

Ostlund, 391 N.J. Super. 390, 400 (App. Div. 2007).  An "appellate court

24

should exercise its original fact finding jurisdiction sparingly and in none but a clear case where there is no doubt about the matter."  Seidman v. Clifton Sav. Bank, 205 N.J. 150, 169 (2011) (quoting Cesare v. Cesare, 154 N.J. 394, 412 (1998)).  We review the trial court's interpretation of law de novo.  Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378 (1995).

"Reversal is reserved only for those circumstances when we determine the factual findings and legal conclusions of the trial judge went 'so wide of the mark that a mistake must have been made.'"  Llewelyn v. Shewchuk, 440 N.J. Super. 207, 214 (App. Div. 2015) (quoting N.J. Div. of Youth & Family Servs. v. M.M., 189 N.J. 261, 279 (2007)).  Such a mistake "can arise in many ways—from manifest lack of inherently credible evidence to support significant findings, obvious overlooking or underevaluation of crucial evidence, or a clearly unjust result."  Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 338 (App. Div. 1978).  However, "[i]f we are satisfied that the trial judge's findings and result could reasonably have been reached on sufficient credible evidence in the record as a whole, his [or her] determination should not be disturbed."  Ibid.  "Consequently, when a reviewing court concludes there is satisfactory evidentiary support for the trial court's findings, 'its task is complete and it should not disturb the result[.]'"  Elrom v. Elrom,

439 N.J. Super. 424, 433 (App. Div. 2015) (quoting Beck v. Beck, 86 N.J. 480, 496 (1981)).

Based on our careful review of the evidentiary record, we cannot conclude the court's findings of fact are not supported by sufficient evidence it deemed credible. The court's determination that Marianne Corradetti's signature on the note and defendants' signatures on the mortgage and HUD-1 were forged is unassailable—the evidence presented at trial establishes defendants were not in the United States on September 25, 2006, when their purported signatures were notarized and all of the documents are dated. Plaintiff was aware prior to trial that defendants disputed their participation in the alleged September 25, 2006 transaction, as well as their signatures on the documents, but it opted not to present any evidence to counter the uncontroverted evidence that defendants could neither have been present for the purported transaction nor executed the documents upon which plaintiff's foreclosure and other claims were founded.

The court's well-supported finding that the purported mortgage transaction occurred through the forgery of defendants' signatures on the note, mortgage and HUD-1 also reasonably provided the lens through which the court viewed the other evidence and the lack of evidence. The court rejected plaintiff's reliance on the HUD-1 to establish that proceeds from the

26

transaction were used to satisfy the WSB and Commence Bank mortgage loans; it reasoned a forged document could not, and did not, establish one of the essential elements of plaintiff's causes of action—that funds purportedly obtained from a forged transaction were actually used to pay off those loans. The record amply supports the court's finding that plaintiff failed, and woefully so, to present any evidence showing the proceeds from the alleged September 25, 2006 transaction were used to satisfy the WSB and Commerce Bank loans. Confronted with a purported transaction evidenced only by forged documents, the court did not find the evidence, which showed only that the WSB and Commerce Bank mortgage loans were discharged, established that funds from the purported transaction were used for the loan payoffs. Indeed, and as the court found, plaintiff failed to present any evidence showing the source of the funds for the loan payoffs, the identity of the payor or that the payoff amounts were those listed in the forged HUD-1.

Plaintiff also reprises a factual argument it made before the trial court. It compares defendants' purported signatures on various documents with those they allegedly (but could not have) signed on September 25, 2006, and contends the court should have found they are all the same. To be sure, the signatures on the various documents, including those on the September 25, 2006 purported note, mortgage and HUD-1 look quite similar, and Marianne

A-5334-16T1

Corradetti's testimony about the signatures was at times contradictory. But plaintiff ignores the court's factual finding, which is supported by sufficient credible evidence and to which we must defer, that the purported September 25, 2006 signatures, some of which were notarized, are forgeries. That the purported September 25, 2006 signatures may look similar to defendants' genuine signatures on other documents does not require the conclusion that the September 25, 2006 signatures are also genuine; as noted, the evidence otherwise supports the court's determination that the purported September 25, 2006 signatures could not have been made by defendants because they were not in the United States when the purported transaction took place.

Plaintiff's trial counsel[11] placed a substantial and impossible burden on its solitary witness, D'Orlando, to establish defendants actually participated in the mortgage transaction, their signatures on the documents were genuine, the proceeds were used to satisfy the WSB and Commerce Bank loans and defendants actually made thirty mortgage payments to Countrywide's service provider. D'Orlando acknowledged he did not possess a scintilla of personal knowledge concerning the alleged September 25, 2006 transaction or any of the other circumstances purportedly reflected in the documents he presented,

---

[11] Plaintiff's trial counsel did not participate in the appeal; plaintiff's appellate counsel had no involvement in the trial.

and the court otherwise found his lack of knowledge and conflicting statements rendered his testimony not credible and the Bank of America payment history unreliable. D'Orlando, through no fault of his own, provided only the minimum testimony necessary to allow a series of documents about which he had no substantive knowledge to be admitted in evidence. See, e.g., New Century Fin. Servs., Inc. v. Oughla, 437 N.J. Super. 299, 326 (App. Div. 2014) (noting that a witness providing the foundation for admission of business records need not "possess any personal knowledge of the act or event recorded").

Plaintiff's case required more. Plaintiff knew defendants denied participation in the purported September 25, 2006 transaction, disputed the validity of the signatures on the closing documents, contested plaintiff's claim the transaction proceeds were used to pay off the WSB and Commerce Bank loans and rejected plaintiff's assertion they ratified the mortgage. Plaintiff rested its proofs at trial on a witness unarmed with the competent and credible evidence necessary to prove plaintiff's case in light of defendant's denials and the uncontroverted evidence showing the closing documents were forged. The court's finding that the proffered evidence was inadequate is supported by the record.

A-5334-16T1

Plaintiff's appellate counsel makes an able and exhaustive effort to establish that, despite the lack of credible evidence presented at trial, the court should have interpreted the evidence differently. Plaintiff's argument that the court should have concluded defendants signed the mortgage documents on a day other than September 25, 2006, is undermined by the evidence showing the signatures were notarized on that date and Marianne Corradetti's testimony, which the court found credible, that neither she nor her husband signed the documents. Plaintiff's assertion that defendants received the benefit of the alleged transaction because the WSB and Commerce Bank mortgages were satisfied from the proceeds ignores that the court determined plaintiff failed to present any evidence the court found credible showing the proceeds were actually used to satisfy those loans. Plaintiff's contention that the documents showed defendants made thirty mortgage payments following the loan fails to account for the absence of any credible evidence showing defendants actually made the payments, and the court's finding that D'Orlando's testimony was not credible concerning the reliability of the prior mortgage servicer's payment history.

Plaintiff argues again that the November 2, 2009 letter defendants allegedly sent in the 2009 mortgage foreclosure proceeding constituted an admission to, or ratification of, the mortgage, but the trial court interpreted the

30

letter differently, finding that, contrary to plaintiff's proffered interpretation, the letter disputed plaintiff's entitlement to a judgment of foreclosure. We do not substitute our judgment for the trial court's interpretation of the evidence. "When more than one reasonable inference can be drawn from the review of" documentary evidence, "then the one accepted by a trial court cannot be unreasonable" and "the mere substitution of an appellate court's judgment for that of the trial court's advances no greater good." State v. S.S., 229 N.J. 360, 380 (2017). We have reviewed the letter and cannot conclude that, given all of the circumstances presented and the court's findings of fact that are supported by credible evidence, the court's interpretation is "so clearly mistaken—so wide of the mark—that the interests of justice demand intervention." Id. at 381.

Plaintiff's causes of action are founded on the validity of the note and mortgage, defendants' acceptance or ratification of the mortgage loan, or evidence establishing defendants received the benefit of the proceeds of the purported September 25, 2006 transaction in the form of satisfaction of the WSB and Commerce Bank mortgages. See Zaman v. Felton, 219 N.J. 199, 217-19 (2014) (explaining factors to be considered in establishing an equitable mortgage); Reibman v. Myers, 451 N.J. Super. 32, 47-48 (App. Div. 2017) (explaining elements of an equitable subrogation claim); VRG Corp. v. GKN

31

Realty Corp., 135 N.J. 539, 554 (1994) (explaining elements of an unjust enrichment cause of action).

Plaintiff's appellate counsel's efforts to resuscitate plaintiff's claims fail, however, because there is sufficient credible evidence supporting the court's finding that defendants did not execute the note or mortgage, and the evidence the court found credible does not establish the proceeds of the purported September 25, 2006 transaction were used to satisfy the WSB and Commerce Bank mortgages or that defendants otherwise ratified the purported transaction. It is not the role of the trial court or this court to fill in the gaps in a plaintiff's proofs or make decisions that are not supported by sufficient credible evidence. Where, as here, the trial court's factual findings are supported by sufficient credible evidence, we defer to those findings. See Rova Farms Resort, Inc. v. Inv'rs Ins. Co. of Am., 65 N.J. 474, 484 (1974). We therefore affirm the court's July 26, 2017 amended final judgment, but remand for the court to consider and determine an issue that was not addressed in its written decision and judgment.

Although we find no error in the court's findings and conclusions related to the purported September 25, 2006 mortgage transaction or the alleged use of the proceeds from the alleged transaction on defendants' behalf, we note one remaining issue the court did not address. In its finding the Bank of America

payment history on the putative mortgage was not sufficiently reliable to support a determination that defendants made payments on the mortgage and therefore ratified it, the court expressly found reliable the "BAC Fee Transaction Histories Prior to Bayview" and the one-page untitled document in Bayview's file together listing 216 transactions from October 20, 2010, through October 15, 2012, showing plaintiff's payment of taxes, fees, and insurance premiums related to defendants' property. The court did not directly address the reliability or unreliability of the "Bayview Customer Activity Statement"—which lists similar transactions for the period of October 25, 2012, through May 19, 2017—beyond stating that Bayview "began its own . . . [s]tatement, presumably after the mortgage was 'boarded.'" However, we note that it appears none of the court's stated reasons for finding the Bank of America payment history unreliable apply to the "Bayview Customer Activity Statement." Together the payments reflected in these documents total a substantial amount, with the "Bayview Customer Activity Statement" listing an outstanding escrow balance of $148,151.88 as of May 19, 2017.

The trial court overlooked these documents and their implications, and it appears plaintiff made the payments to protect its interests in the property based on its assertion it was the mortgagee. Plaintiff did not present any evidence demonstrating defendants had knowledge of the payments reflected

in these documents—the issue was not addressed by any proofs at trial—and thus failed to demonstrate that their payment by plaintiff established defendants' acknowledgment or ratification of the alleged mortgage. However, the court's finding the documents are reliable supports a claim by plaintiff for recovery or reimbursement of the sums paid as reflected in the documents separate from the alleged September 25, 2006 mortgage or any entitlement to an equitable lien based on the alleged disbursement of funds from the putative mortgage transaction.

It is not our intention that this opinion foreclose plaintiff from appropriately seeking recovery or reimbursement of sums it has paid that might have inured to defendants' benefit based on its erroneous belief it held an enforceable mortgage or equitable lien on defendants' property. We therefore remand for the parties and the court to address the issue of plaintiff's entitlement, if any, to the sums it paid on defendant's behalf and the manner in which that issue will be addressed and decided. We offer no opinion on the merits of the potential claim, possible defenses or the procedure the parties and the court should employ to address the issue. We remand because plaintiff's entitlement to recovery or reimbursement of the sums paid that inured to defendant's benefit as suggested in the documents the court found reliable, or otherwise, should be addressed.

34

Affirmed and remanded for further proceedings. We do not retain jurisdiction.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

_____

**ACCURSO, J.A.D., dissenting.**

This case turns on our struggle with the standard of review. And, essentially, on one finding, that the loan documents the Corradettis purportedly signed on September 25, 2006 are forgeries. The majority terms that finding "unassailable." Ante at 26. I think it's unsupported and so "inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice." Griepenburg v. Twp. of Ocean, 220 N.J. 239, 254 (2015) (quoting Rova Farms Resort v. Investors Ins. Co., 65 N.J. 474, 484 (1974)). Accordingly, I respectfully dissent.

This case is difficult for the reasons the majority has so capably emphasized, the proofs are thin and appellate review of the factual findings of the trial court sitting in a non-jury case is so deferential. There is no question but that additional proofs would make the case easier to resolve.[1] The issue,

_____

[1] I am not so convinced as the majority that the fault for that lies exclusively with the bank. The summary judgment record reveals several important documents produced by the Corradettis in discovery, including a letter from Countrywide to Anthony Corradetti dated September 7, 2006, outlining the writer's understanding "of the current situation pertaining to your mortgages," and identifying the Commerce mortgage as a "[b]lanket mortgage covering 2 commercial properties, residence in Cinnaminson and 2nd position on Ocean City for $1,353,000" having a monthly payment of $21,432 for principal, interest, taxes and insurance and a "1st Mortgage on Ocean City for $405,000," having a monthly payment of $2705, principal and interest only for total
(continued)

however, is not whether the case could have been better tried.  The answer to that question is undoubtedly yes.[2]  The sole question to be resolved is whether, based on those few facts in the record, "there is substantial evidence in support of the trial judge's findings and conclusions."  <u>In re Tr. Created By Agreement</u>

---

(continued)
monthly mortgage payments of $24,442.  The letter proposed a "[n]ew first mortgage on Ocean City property for $1,800,000.  This would result in the two commercial properties being paid off in full" and a monthly savings of $3,725.87.  The Corradettis also produced a September 29, 2006 letter from Boardwalk Title Agency referencing the "Corradetti refinance . . . <u>Closing date:  September 25, 2006 Disbursement Date:  September 29, 2006</u>" enclosing a "trust account check in the amount of $1,108.80," "represent[ing] the proceeds of your transaction" and a copy of the title agency's check.  Mrs. Corradetti had no knowledge of the documents.  The bank deposed the Corradettis' adult daughter, who apparently produced the documents on her parents' behalf, who could only say they did not come out of the file drawer in the Cinnaminson house where her parents kept their financial records and may have come out of one of the file cabinets in Mr. Corradetti's office.

[2]  This is not meant as a criticism of trial counsel.  We are aware the title agency that closed this loan is no longer in business and plaintiff could not locate the notary who acknowledged the Corradettis' signatures on the loan documents.  We are also aware that Mr. Corradetti, apparently the only person with personal knowledge of the several mortgages on the Ocean City property, was unavailable to testify.  I surmise the inability of either side to present a witness with personal knowledge of this transaction led to the failure to introduce at trial what would appear to be relevant documents in the summary judgment record, such as the Countrywide letter to Mr. Corradetti of September 9, 2006 outlining the proposed loan.  Given what we know, I am somewhat uncomfortable with the repeated emphasis on the absence of documents in the record that could have assisted in resolving this matter.  I thus have attempted to confine my analysis of the court's findings to the evidence in the trial record, not the absence of documents we have no way of knowing were available to the parties.

2

Dated Dec. 20, 1961, ex rel. Johnson, 194 N.J. 276, 284 (2008) (quoting Rova Farms, 65 N.J. at 484).

The trial court accepted that when the Corradettis left for their religious pilgrimage to Croatia in September 2006, there were two mortgages recorded against their Ocean City shore house securing loans of $2.8 million. One was to World Savings for a $500,000 loan given in 2003 and the other to Commerce Bank for a loan also given in 2003 in the original principal amount of $2.3 million. Following the recording of the $1.8 million Countrywide mortgage at issue on October 3, 2006, less than ten days after the Corradettis returned to New Jersey, both those mortgages were marked satisfied and cancelled of record, the World Savings mortgage on October 20 and the Commerce mortgage on November 6.[3]

Marianne Corradetti, eighty-five years old at the time of trial, testified she knew nothing about any of those loans, and specifically that she would never have agreed to allow Countrywide or Bank of New York to place a mortgage on the property because it "was [her] dream house." Mrs. Corradetti eventually allowed that she knew they had a mortgage on the shore house when they purchased it in 1992, but testified her husband Anthony, eighty-

---

[3] Funds from the Countrywide refinance were also used to satisfy a $2,482.38 State tax lien against the Corradettis' Ocean City property.

three at the time of trial and suffering from Alzheimer's, told her "[s]ome time ago" that they were "free and clear."  Shown the purchase money mortgage on cross-examination, Mrs. Corradetti testified she thought the signature on the document was hers but said she did not know whether her husband's signature was his, testifying "I don't know.  I don't think so."

Mrs. Corradetti also testified her husband handled all of their business dealings with banks and insurance companies, and that she "wasn't in on anything in [his] business."[4]  She agreed with the bank's lawyer that if she and her husband "were going to get a mortgage loan from Countrywide" that "he would be the one to talk to."  She also agreed she "would only show up and sign something when he told [her] to do that."  Shown the September 25 Countrywide note bearing her signature, Mrs. Corradetti testified unequivocally "[t]hat is not my handwriting."

Mrs. Corradetti also swore unequivocally that it was not her signature on the September 25 Countrywide mortgage, although at her deposition she testified only that she was "not sure" whether it was her signature.  She gave the same testimony about the HUD-1 and the other documents for the

---

[4]  Mrs. Corradetti testified her husband owned his own business, a general merchandise wholesaler, which had its ups and downs, but "was sliding" since about 2000.

4

September 25 transaction, testifying at her deposition that she was "not sure" whether it was her signature on the documents and at trial that she had "no doubt" it was not her signature.

Although initially testifying on cross examination she "was sure" she did not sign the $2.3 million Commerce Bank mortgage given in 2000 and cancelled in 2003, Mrs. Corradetti changed her testimony after being confronted with her deposition where she had admitted the authenticity of her signature on the same document. Asked how that $2.3 million mortgage had been satisfied if not replaced with the second $2.3 million Commerce mortgage, which was cancelled only weeks after the September 25, 2006 loan transaction purportedly took place, Mrs. Corradetti testified she did not know. She was also adamant she had never seen the 2010 letter from her and her husband to the Office of Foreclosure objecting to the entry of final judgment in the prior foreclosure, saying "[t]hose aren't our signatures at all. Never."

Mrs. Corradetti also testified she did not write the mortgage check for $13,126.16 in November 2006 for the shore house mortgage, nor any of the other almost thirty checks logged in the bank's payment history, which she claimed was not unusual as "[i]t was always done at [Anthony's] office." In response to questions by the trial judge, Mrs. Corradetti testified she and her husband sold two commercial buildings related to his business in the last ten

5

A-5334-16T1

years. Observing that documents in evidence "suggest[ed] that maybe there were some mortgages taken out on the Ocean City property for some significant amount of money," the trial judge asked Mrs. Corradetti if she knew whether that money was used for the business or for household bills. She responded she did not "know any of that."

Based on Mrs. Corradetti's testimony, the trial judge found "Mrs. Corradetti believes what she says." He also found, however,

> that she is not aware of what she signed and what she did not sign, and she is not aware of what Mr. Corradetti signed and what he did not sign. Her memory was lacking as to many documents, and her demeanor was such that she seemed unsure and hesitant to say whether certain documents were signed by her or were not signed by her; she seemed to be calculating what answer her attorney was expecting more than giving the answer that she remembered.

The court noted the best example of that was Mrs. Corradetti's testimony about the first Commerce Bank mortgage for $2.3 million given in 2000, where "she simply reversed her testimony." It found Mrs. Corradetti "is simply not sure what documents she did sign or did not sign."[5] The court found "Mrs. Corradetti's testimony with regard to her not signing the subject Note, Mortgage, and HUD-1 Settlement Statement on September 25, 2006 to

---

[5] At her deposition, Mrs. Corradetti denied she signed the handwriting exemplars produced by her counsel in discovery.

be credible; <u>as to what other documents were signed or not signed by her and her husband, the court finds her testimony not credible</u>." (emphasis added.)

Thus I find inexplicable the court's leap from those findings to its conclusion that the loan "documents are not authentic," "do not create a valid mortgage" and that defendants succeeded on their affirmative defense of forgery "by clear and convincing evidence." <u>See</u> <u>Dencer v. Erb</u>, 142 N.J. Eq. 422, 426 (Ch. Div. 1948) (holding "statements contained in the acknowledgment may be shown to be untrue. . . . [b]ut to establish its falsity and overcome the strong presumption of its integrity the proof must be clear, satisfactory, and convincing") (citations omitted). There is no question but that the Corradettis did not sign the loan documents on the day they are dated, Monday, September 25, 2006. Their passport stamps established they did not return to New Jersey until the following day, September 26.[6] In addition to

---

[6] It is unlikely Mrs. Corradetti's own testimony, standing alone, could be relied on to establish that fact. I quote her <u>direct examination</u> on that point:

> Defendant's Counsel: Now, Mrs. Corradetti, in 2006, September 25th of 2006, where were you and Mr. Corradetti?
>
> Mrs. Corradetti: Preparing to go away.
>
> Defendant's Counsel: No. September 25th?

(continued)

their not returning to New Jersey until Tuesday, September 26, the court noted

(continued)

Mrs. Corradetti:  The 25th.

Defendant's Counsel:  You were away from the 18th to the 26th.

Mrs. Corradetti:  Okay.

Defendant's Counsel:  Where were you on September 25th?

Mrs. Corradetti:  In Croatia.

Defendant's Counsel:  Were you in Toms River or Burlington County, New Jersey?

Mrs. Corradetti:  I don't remember the two we were in.

Defendant's Counsel:  No.  No.  No.  Were you in New Jersey, the United States?

Mrs. Corradetti:  Yeah.

Defendant's Counsel:  On September 25th, 2006, you were in Croatia, right?

Mrs. Corradetti:  We were in Croatia.

Defendant's Counsel:  Were you in Toms River at the same time you were —

Mrs. Corradetti:  Oh, no.  How could I be?

Defendant's Counsel:  Okay.

The Court:  So Stipulated.

the HUD-1 in evidence states it was "Printed on 09/26/2006 at 15:52," the day

after original signatures were purportedly affixed.[7]   But a finding that a

document was not signed on the day it's dated does not ineluctably lead to the

conclusion the document was forged,  and certainly should not here in light of

the court's critical finding that Mrs. Corradetti could not reliably say what

documents she and her husband signed or did not sign.[8]

Instead of focusing on the evidence in the record, the trial judge focused

on what was not there:

---

[7]   Similarly the closing instructions, which were not admitted in evidence at trial but were included in the summary judgment record, reflect they were "prepared on 09/25/2006 [at] 16:43:51," that is, near the close of business on the day the documents were purportedly signed.

[8]   A far simpler explanation might be provided by the Truth in Lending Act's three-day right of rescission in the borrower.  See 15 U.S.C. § 1635(a).  If the loan documents were executed when the Corradettis were back in New Jersey on September 26, the day the HUD-1 statement appears to have been printed, this loan could not have been funded until Saturday, September 30.  As there are   no   fed   wire   transactions   on   the   weekend,   see https://www.federalreserve.gov/paymentsystems/fedfunds_about.htm,   the World Savings and Commerce Bank mortgages could not have been paid off until after the start of the new month, Monday, October 2, 2006.  Although 12 C.F.R. § 226.23(e) permits a borrower to waive the right to rescind in the event of "a bona fide personal financial emergency," backdating occurs, see, e.g., In re Shaw, 178 B.R. 380 (D.N.J. 1994), and sometimes only for reasons of "ease and economy," see, generally, Jeffrey L. Kwall & Stuart Duhl, Backdating, 63 Bus. Law. 1153, 1171 (2008).

A-5334-16T1

> [T]here is no handwriting expert who testified that the signatures are in fact defendants.[9] There is no evidence that defendants authorized someone else to sign their names for them, to act as their amanuensis. See N.J.S.A. 46:14-4.2. There is no evidence that defendants authorized or asked someone to impersonate them, and that the notary was somehow duped. There is no evidence that defendants designated an agent to sign on their behalf, or gave a power of attorney to someone to sign the documents. There is no evidence that defendants had an agreement with Countrywide to enter into this mortgage on September 25, 2006 or any other day. In the absence of such evidence, the only conclusion that can be reached is that the signatures are not the defendants' signatures, and their signatures were forged on the Mortgage, the Note, and the HUD-1 Settlement Statement.

While I agree there is nothing in the record to suggest the Corradettis inveigled someone to act as their amanuensis, or any of the other things the court imagined, I cannot accept there is "no evidence" in this record "that defendants had an agreement with Countrywide to enter into this mortgage on September 25, 2006 or any other day." Among the evidence supporting the existence of an agreement by Countrywide to lend $1.8 million to the Corradettis secured by a first mortgage on their Ocean City shore house is the note and mortgage bearing their signatures; the HUD-1 closing statement

---

[9] It is unclear why the court held the absence of a handwriting expert against the bank when the Corradettis were the party asserting the affirmative defense of forgery.

noting the payoff of their existing World Savings and Commerce Bank mortgage loans; the discharge of those mortgages shortly after the recording of the Countrywide mortgage the week after the Corradettis returned from Croatia; the twenty-nine loan payments of more than $13,000 each month from November 2006 through March 2009 reflected in the prior servicer's payment history; the November 2009 complaint in the prior foreclosure action, alleging default as of April 1, 2009, the same date reflected in the prior servicer's payment history in the record sent to Mrs. Corradetti during the pendency of that action; the motion for final judgment filed in that action in July 2010; the letter from the Corradettis to the Foreclosure Unit objecting to the amount claimed due; and the Corradettis' failure to pay any real estate taxes or insurance on their shore house for over eight years.

The majority characterizes the finding of forgery as "reasonably provid[ing] the lens through which the court viewed" the other evidence in the record. I would put it differently. I would conclude the court's finding of forgery, for which the only support in the record is that the documents were not signed on the day they are dated, infected its other findings. Most important, it allowed the court to disregard the HUD-1 statement linking the Countrywide loan to the payoff of the Corradettis' existing mortgages to World Savings and Commerce Bank. The trial court accepts defendants' mortgages

11

were paid off, it holds only that "[t]here is nothing in the record of an agreement between the defendants and Countrywide that Countrywide money was to be used to satisfy the World Savings Bank and Commerce Bank mortgages."[10] The HUD-1, of course, evidences that agreement. The trial court only rejects the HUD-1, as far as I can tell, for its being dated the day before the Corradettis returned to New Jersey, notwithstanding the notation on the document that it was printed the following day, when the Corradettis were back in New Jersey and available to sign it. Critically, the Corradettis offer no explanation as to how they paid off the World Savings and Commerce Bank mortgages if not with Countrywide's money.

The trial court's fact-finding surrounding the servicer's records of loan payments and default is also concerning. The glaring problem with the payments is that the bank offered nothing to show that they were made by the Corradettis. The trial court, however, goes well beyond simply stating the obvious. The court found as a fact, apparently simply from a review of the documents, that "Bayview never checked and confirmed the information contained in the BAC payment history." It also found the testimony offered by

---

[10] The judge also found that even if there were proof that Countrywide money was used to pay off the World Savings and Commerce Bank mortgages, the bank would not be entitled to assert equitable subrogation because defendants "never agreed that Countrywide could pay off the two mortgages."

12

plaintiff's witness "with regard to Exhibit P5," the prior servicer's payment history "incredible and not consistent with what the records actually document, how the records were assembled or created, and what the process was for confirming the information in the records." The court explained it rejected the witness's testimony explaining how Bayview, his employer for the last fourteen years, "boards" loans it accepts for servicing from another servicer because

> [a]t various times, [the witness] testified that two employees did a 130 point data check, and at other times two employees did a 132 point data check, before a mortgage was "boarded" for servicing. He did not seem to feel that there was a big difference between 130 points and 132 points; however, the court finds that it shows a failure to comprehend the importance of precision in his testimony.

A review of the witness's trial testimony confirms the witness and lawyers for both sides referred alternately to both a 130 and to a 132 point check. But the witness was never asked to clear up the discrepancy, making a credibility finding based on that point suspect. The court further criticized the witness for failing to "testify that monthly payments were made beginning in November 2006 and continued until March 2009, a total of nearly 30 payments, and that the total payments were over $350,000," positing "[t]hat might have been persuasive testimony." But the witness identified the

payment record in evidence, which reflected those twenty-nine payments, each over $13,000, and he noted both the date of the mortgage, September 25, 2006, and that the loan went into default for non-payment on April 1, 2009, with the last payment being made on March 16, 2009.  Thus I cannot understand the significance for the trial court of the witness's failure to "testify that monthly payments were made beginning in November 2006 and continued until March 2009, a total of nearly 30 payments, and that the total payments were over $350,000."

As already noted, the problem with the payment record is its obvious limits; it does not include cancelled checks showing who made the twenty-nine payments.  Thus the court's difficulty in interpreting the servicing records, which it failed to ask the witness to explain, or its speculations about whether there could have been some other servicer before Bank of America, which likely could have been answered by the witness had anyone asked, would appear beside the point.

More troubling, the court reaches several conclusions as to the reliability of the documents based on purported gaps it perceived in the records, which seem both unnecessary and not well-founded.  Its speculation that the nearly thirty payments logged on this loan might be explained if the same servicer who serviced the Countrywide mortgage loan also serviced the prior

14

Commerce Bank and World Savings mortgage loans is particularly troubling given they were all separate loans made by different banks at different times, with different loan numbers, terms, payment amounts and due dates. Those off-point musings for me, which the judge made a part of his written opinion in this matter, only reinforce my view that the factual findings here are seriously flawed and should not get our customary unswerving deference.

The court's conclusions as to the letter of November 2, 2009, purportedly from the Corradettis to counsel for the bank and the Foreclosure Unit in response to the bank's motion for final judgment in the prior foreclosure highlights the flaws in the fact finding. The bank's final judgment motion, which was admitted in evidence at trial, was served on the Corradettis at their home address in Cinnaminson (the same address as on the invoice for the Corradettis' pilgrimage admitted in evidence at trial) by certified and regular mail on July 7, 2010. The notice of motion advised that final judgment would be entered in the discretion of the court unless the party served notified the Foreclosure Unit and the attorney for the moving party within ten days of service of an objection to the entry of the order. The letter, purportedly from the Corradettis and bearing both their signatures, is dated July 19, 2010, addressed to both the Foreclosure Unit and counsel for the bank and includes a

subject line referencing the motion for final judgment with the docket number of the prior foreclosure. It states:

> Dear [Counsel]
>
> You are hereby notified that I object to the entry of a final judgment in the above reference matter. I disagree and dispute the amount that you show as amount owed.

The trial court acknowledged the bank's argument that the letter was proof of an agreement between Countrywide and defendants because "if there was not a valid mortgage, defendants would have written there was no agreement and no mortgage." It found, however, that "[w]hile the letter purports to be signed by the defendants, Mrs. Corradetti's testimony is that she did not sign the letter, and that is not her signature on the letter. There is no evidence to the contrary."

The judge also rejected the bank's argument that the Corradettis not only failed to repudiate the mortgage "but impliedly admitted their assent to same by only contesting the amount due." The judge found:

> [p]laintiff misreads the letter. Plaintiff argues that there is just one point made in the letter: that defendants object to the amount owed. The letter clearly states, however, that defendants object to the entry of judgment. That statement could not be made more clearly. A second objection is to the amount due. Even if you read the second sentence as

dependent on the first sentence, defendants are not conceding or ratifying the validity of the mortgage.

Further, defendants were pro se defendants. Plenty of trained writers and legal advocates might not be as clear as plaintiff is demanding defendants should have been in their letter objecting to the final judgment.

Two points need to be made about the trial court's finding as to this letter. First, the trial court's reliance on Mrs. Corradetti's testimony that she did not sign the letter is obviously at odds with its finding that her testimony as to any documents signed by her and her husband beyond "her not signing the subject Note, Mortgage, and HUD-1 Settlement Statement on September 25, 2006 . . . the court finds . . . not credible." The judge having already concluded Mrs. Corradetti was not credible when she testified that neither she nor her husband signed this letter, there is actually nothing in the record to dispute its authenticity.

Second, I find it impossible to accept that your typical homeowners receiving by certified mail the motion for entry of final judgment of foreclosure in evidence, listing the date of the note and mortgage, its recording, the address of the property and claiming over $1.8 million due that the homeowners do not recognize as a mortgage they gave for a loan of that size, write the three-line letter the Corradettis wrote. The trial court appears to

17

have lost all sight of the import of this letter in the context of this contested residential foreclosure proceeding.

The issue is not whether the Corradettis objected to the entry of final judgment or only to the amount due. An objection to the amount due is an objection to the entry of final judgment. See Wells Fargo Bank, N.A. v. Garner, 416 N.J. Super. 520, 523-24 (App. Div. 2010). The issue is that the Corradettis' defense to this foreclosure is that it is a fraud, that their names were forged on the loan documents, that they never borrowed $1.8 million from Countrywide and never gave it a mortgage on their Ocean City shore house. This letter from the Corradettis obviously does not square with that defense, especially considering the Corradettis would have already been personally served with the complaint and did not file an answer asserting the fraud. Reasoned fact finding requires the trier of fact to weigh conflicting evidence, not explain it away by refusing to acknowledge its import for proof of a proposition or its defense. See Pioneer Nat'l Title Ins. Co. v. Lucas, 155 N.J. Super. 332, 339 (App. Div.) (reversing findings in a bench trial based on the trial court's failure to "properly evaluate significant evidence," resulting in "manifestly erroneous" inferences from the evidence), aff'd, 78 N.J. 320 (1978).

Plaintiff was required to establish by a preponderance of the evidence its entitlement to foreclose the recorded mortgage it obviously believed it held on the Corradettis' property, reflected in the majority's acknowledgment that the bank has been paying the real estate taxes and homeowners' insurance premiums on the Corradettis' shore house since assuming the mortgage loan, see ante at 33. That means the bank had to prove based on all of the evidence in the record, fairly considered, that it was more likely than not that the Corradettis replaced the World Savings and Commerce Bank mortgages on their shore house totaling $2.3 million with the $1.8 million Countrywide mortgage recorded weeks before the cancellation of the World Savings and Commerce Bank mortgages were recorded, that they failed to make payment as required and that the bank was entitled to foreclose. See Great Falls Bank v. Pardo, 263 N.J. Super. 388, 394 (Ch. Div. 1993).

Here, the trial court apparently found it more likely that someone forged the Corradettis' signatures on the loan documents, but instead of making away with cash, paid $8840.26 on the Corradettis' behalf at closing, arranged for the payoff of their prior mortgages totaling $2.3 million, made payments on the fraudulent mortgage for the next two-and-a-half years to cover their tracks, and when the Corradettis finally discovered the fraud when the bank tried to foreclose the bogus mortgage, they wrote the three-line letter to the bank's

19

counsel "object[ing] to the entry of a final judgment" because they "disagree[d] and dispute[d] the amount that you show as amount owed." The court comes to that extraordinary conclusion based, as far as I can tell, only on proof that the documents were not signed on September 25, 2006, the day they were dated, and thus, a fortiori, that they "are forged documents, and anyone who forges documents might make efforts to cover their forging." I do not believe adherence to our standard of review requires me to accept such findings, as I view them as "so wide of the mark that a mistake must have been made." C.B. Snyder Realty, Inc. v. BMW of N. Am., Inc., 233 N.J. Super. 65, 69 (App. Div. 1989) (quoting Pioneer, 155 N.J. Super. at 338).

This case would be decidedly different for me had the trial judge deemed Mrs. Corradetti a credible witness regarding the documents she and her husband signed instead of one "who is not aware of what she signed and what she did not sign." See In re Return of Weapons to J.W.D., 149 N.J. 108, 117 (1997) (noting "[d]eference to a trial court's fact-findings is especially appropriate when the evidence is largely testimonial and involves questions of credibility"). Faced with a witness it deemed so unreliable that it rejected as not credible everything she said about what documents she signed or didn't sign, except as to her not signing the "Note, Mortgage and HUD-1 Settlement Statement on September 25, 2006," the trial court, in my view, went wide of

the mark in finding defendants carried their burden to prove their affirmative defense of forgery by clear and convincing evidence based on her testimony. To me, those findings are fatally inconsistent and not deserving of our deference.

Because I do not agree there is "adequate, substantial and credible evidence," Rova Farms, 65 N.J. at 484, in this record to support a finding that the Corradettis established forgery by clear and convincing evidence, I would reverse the trial court's decision invalidating the September 25, 2006 note and mortgage and remand for retrial or dismissal without prejudice.[11]  Because the majority affirms a finding of forgery, which I do not believe is supported by substantial evidence in the trial record, I respectfully dissent.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

---

[11]  Doing so I believe is what our standard of review requires.  See Bank of N.Y. v. Raftogianis, 418 N.J. Super. 323, 363 (Ch. Div. 2010) (dismissing the bank's foreclosure complaint after trial without prejudice to its right to institute a new action when it could prove its right to proceed on the loan documents). I can accept one might reasonably conclude plaintiff did not prove its entitlement to foreclose the Countrywide mortgage on the evidence adduced at trial, even though I "might have reached a different conclusion were [I] the trial tribunal."  State v. Johnson, 42 N.J. 146, 162 (1964).  What I cannot accept is that defendants proved the loan documents were forgeries by clear and convincing evidence, thus invalidating those loan documents.